**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| COVENTRY HEALTH CARE, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:09-cv-1009 |
| | ) | |
| v. | ) | Senior Judge Wiseman |
| | ) | Magistrate Judge Knowles |
| CAREMARK INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT CAREMARK'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT**

---

In support of its Motion for Summary Judgment against Plaintiffs, Defendant Caremark Inc. n/k/a Caremark, L.L.C. ("Caremark"), respectfully states as follows:

## SUMMARY OF ARGUMENT

Caremark served as Plaintiffs' pharmacy benefits manager ("PBM") from January 1, 2000 until January 1, 2010. During the term of the contract, Caremark processed pharmacy reimbursement requests submitted by the Department of Defense in accordance with the law governing such claims. Throughout the time period relevant to this dispute, moreover, Coventry was aware that Caremark was treating these claims as "in network" without regard to whether or not the DoD pharmacy had contracted to be part of Coventry's "network." This was consistent with both the contract and the applicable law.

After Coventry decided to terminate the contract with Caremark, Coventry, for the first time, alleged that Caremark should have been denying DoD pharmacy claims as "out-of-network" all along, based on a never-before-discussed "exception" to the general rule regarding

DoD claims – an exception which applies, if at all, to only a very narrow subset of all government pharmacy claims.

While the parties dispute the meaning and scope of the so-called "HMO exception," this court need not rule on that issue in order to grant summary judgment in this case. The reason is simple: regardless of the meaning and scope of the HMO exception, Coventry has acknowledged in this case two dispositive facts: (1) that it never provided Caremark with any written instructions regarding the processing of these DoD claims (as it was required to do under the terms of the contract itself); and (2) that it did not provide Caremark with the basic information that Caremark would have needed in order to *determine* whether any given DoD pharmacy claim fit within the narrow exception Coventry is now belatedly trying to invoke. Accordingly, the undisputed evidence in this case demonstrates that Caremark did not breach the contract between the parties, and Caremark should be granted summary judgment.

## FACTUAL BACKGROUND

Caremark provides pharmacy benefit management services to sponsors of health benefit plans, such as insurance companies, private employers, unions, and government employee plans. (Statement of Undisputed Facts at ¶ 1). Caremark's services include filling prescriptions through Caremark's mail order pharmacies, providing access to a national network of retail pharmacies, and processing reimbursement requests from plan members and government agencies. (*Id*. at ¶ 2). Caremark provides these services pursuant to written contracts with its clients. (*Id*. at ¶ 3).

Caremark entered into such a contract with Plaintiff Coventry Health Care, Inc. ("Coventry"). (*Id*. at ¶ 4). Coventry is an insurance company whose subsidiaries, collectively, offer thousands of different health insurance plans throughout the country to their members, including such products as PPO plans, POS plans and HMO plans. (*Id*. at ¶ 5). Of the plan types

4014473.10

which Plaintiffs make available to their members (PPO, HMO and POS), the majority of Plaintiffs' members have opted for PPO plans – not the more restrictive HMO plans. (*Id*. at ¶ 6). Plaintiffs engaged Caremark to process and pay pharmacy claims submitted by or on behalf of the members of Coventry's various health plans. (*Id*. at ¶ 8).

During the time period relevant to this dispute, Caremark processed millions of pharmacy claims on behalf of Coventry. (*Id*. at 13). One miniscule subset of all these claims consisted of federal government reimbursement requests for prescriptions dispensed by the Veterans Administration ("VA"), Indian Health Services ("IHS") and the Department of Defense ("DoD"). (*Id*.) These government agencies operate their own pharmacies to provide prescription drugs to their beneficiaries. (*Id*. at 14).

The DoD operates pharmacies in military treatment facilities located on military bases serving active duty personnel. (*Id*. at ¶ 12). Some active duty personnel also have health care coverage through private insurers such as Coventry. (*Id*.). These individuals are often referred to as "dual eligibles" because there are two separate sources of coverage for their medical needs – the federal government and private insurance companies. (Breslin Decl. at ¶ 9). When a DoD pharmacy dispenses a drug to a "dual eligible," the federal government absorbs the cost of the drug provided to the member of the military and then submits claims for reimbursement to that member's private insurance plan. In order to maximize the federal government's recovery from private health insurance plans for these services and drugs, federal law allows the United States to recover from the private insurer to the extent the insurer would be liable to the individual plan participant. (Statement of Undisputed Facts at ¶ 15).

Although the United States essentially submits DoD reimbursement requests as an assignee of the plan participant, not all plan restrictions may be lawfully applied against the

4014473.10

3

DoD. (*Id.* at ¶ 17). The DoD statute contains an anti-discrimination provision which prohibits a private insurance plan from imposing any type of plan restriction that has the effect of discriminating against DoD claims solely on the ground that the service was provided at a military facility. (*Id.* at ¶ 18). As explained in the implementing regulations, "[u]nder 10 U.S.C. § 1095(b), no provision of any third party payer's plan <u>having the effect</u> of excluding from coverage or limiting payment for certain care if that care is provided in a facility of the uniformed services shall operate to prevent collection by the United States." 32 C.F.R. § 220.3(a) (emphasis added). The regulations go on to state that "[t]hird party payers may not treat claims arising from services provided in facilities of the uniformed services less favorably than they treat claims arising from services in other hospitals." (Statement of Undisputed Facts at ¶ 20).

Moreover, the regulations provide the following examples of impermissible exclusions which prohibit Caremark from denying claims from federal government pharmacies on the basis that they are out-of-network (i.e. - lacking a participation agreement and/or privity) as Plaintiffs urge in this case:

> A provision in a third party payer's plan that purports to disallow or limit payment for services provided by a government entity or paid for by government program (or similar exclusion) is not a permissible ground for refusing or reducing third party payment.

32 C.F.R. § 220.3(c)(1).

> The lack of a participation agreement or the absence of privity of contract between a third party payer and a facility of the uniformed services is not a permissible ground for refusing or reducing third party payment.

32 C.F.R. § 220.3(c)(4).

The laws with respect to other types of government pharmacy claims, including VA and IHS claims, mirror the anti-discrimination regulations governing DoD claims. *See* 38 U.S.C. §

4014473.10

1729(f) (VA anti-discrimination statute); *United States v. Blue Cross/Blue Shield of Alabama*, 999 F.2d 1542, 1546-47 (11th Cir. 1993) (interpreting same); 25 U.S.C. § 1621(c) (IHS anti-discrimination statute).  In short, it is illegal for health plans to deny claims submitted by government pharmacies solely on the grounds that they are out of the plan's network of pharmacies.

To comply with these regulations, Caremark processes all DoD claims as if they had been submitted by a pharmacy in its network or in the network of its clients.  (Statement of Undisputed Facts at ¶ 22).  The reason for treating all DoD (and VA and IHS claims) as "in network" is simple – as noted above, denying a DoD claim on the grounds that the military pharmacy was not in the plan's network of contracted pharmacies would violate federal law.

Caremark informed Coventry that it would treat DoD claims which it processed on Coventry's behalf as in-network.  (*Id.* at ¶ 23).  Coventry did not object to Caremark's treatment of DoD claims as in-network until after it notified Caremark that it would be terminating the contract and ending the parties' ten-year business relationship.  (Id. at ¶ 25).

In support of its claim that Caremark breached the contract, Coventry now contends, for the first time, that Caremark should have denied all DoD reimbursement requests as out-of-network.  Citing what appears to be a very narrow exception to the general anti-discrimination laws governing pharmacy claims, Coventry essentially claims that Caremark should have, *sua sponte*, denied all DoD claims as "out of network" because none of the DoD pharmacies were in Coventry's network.  For the reasons set forth below, Plaintiffs cannot sustain their breach of contract claim.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). "An issue of fact is 'genuine' if a reasonable person could return a verdict for the non-moving party." *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587-88 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993). "In such a situation, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotations omitted).

## LEGAL ARGUMENT

### A) Caremark Did Not Breach The Agreement Because It Processed Department Of Defense Pharmacy Claims In Accordance With The Law

To recover for breach of contract, a plaintiff must prove that the defendant had a contractual obligation owed to the plaintiff and that the defendant breached that obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Interpretation of written instruments is a question of law. *White v. Pines Community Improvement Ass'n, Inc.*, 939 A.2d

165, 175 (Md. 2008)[1]; *see also Della Ratta, Inc. v. American Better Community Developers, Inc.*, 380 A.2d 627, 633-34 (Md. 1977)(finding that "[w]here the language of a contract, considered in the light of its subject matter, and its object or purpose, is clear and unambiguous, the construction of the contract is a matter of law for the court.").  Moreover, if a contract is clear, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the parties' position would have thought it meant.  *Jones v. Hubbard*, 740 A.2d 1004, 1015 (Md. 1999); *Billmyre v. Sacred Heart Hospital of Sisters of Charity, Inc.*, 331 A.2d 313, 316 (Md. 1975)(citations omitted).

Here, Plaintiffs cannot make out a breach of contract claim because Caremark met its contractual obligations in that (1) Caremark processed all government pharmacy claims – including DoD pharmacy claims - in accordance with the law; and (2) it is undisputed that Plaintiffs never provided any written instructions to Caremark to process DoD claims differently than all other government claims.  In the absence of any specific written instructions to process DoD claims in the manner that Coventry now suggests they should have been processed, Coventry cannot maintain its breach of contract claim against Caremark.

The parties do not dispute that the Agreement governs the processing and adjudication of the DoD pharmacy claims at issue on behalf of Plaintiffs.  (Statement of Undisputed Facts, ¶ 10). Section 4.1(g)[2] of the Agreement, entitled <u>Government Agency Submitted Claims</u>, states in relevant part that "COVENTRY authorizes Caremark . . . to process [Government] Claims in accordance with COVENTRY's written direction, which shall be in accordance with applicable laws and regulations."  In addition to Section 4.1(g), Section 2.4(a) of the Agreement establishes

---

[1] Maryland law governs the contract between the parties pursuant to Section 19.11 thereto.  (*See* MPDP Agreement, Exhibit 3 to Statement of Undisputed Facts).

[2] This section was added with the Amendment to the MPDP Agreement effective July 1, 2006.  The original MPDP Agreement did not include a provision specifically addressing government claims processing prior to this amendment but did include Section 2.4(a) which required Caremark's compliance with all federal laws and regulations. (Statement of Undisputed Facts at ¶ 28).

Caremark's general obligations with respect to compliance and states in relevant part: "[a]t all times that this Agreement is in effect CAREMARK agrees that it shall comply with all laws, rules, regulations and ordinances of municipal, county, state and federal authorities now or hereafter in force and effect to the extent that they directly or indirectly bear upon the services provided pursuant to this Agreement . . . ."

Thus, Caremark was contractually obligated to process DoD pharmacy claims at all times in accordance with applicable laws and regulations; and the Plaintiffs' provision of written direction had to be compliant with those same laws and regulations. In fact, Plaintiffs admit in their Complaint that Caremark must pay pharmacy claims if required to do so by "an overriding law or regulation" regardless of the instructions of the applicable Coventry plan design rules. (Statement of Undisputed Facts, ¶ 30). As quoted above, 32 C.F.R. § 220.3(c)(4) holds that the lack of a participation agreement (i.e. – out-of-network status) "is not a permissible ground for refusing or reducing third party payment." Yet Coventry never instructed Caremark to deny DoD pharmacy claims on any other basis. (Statement of Undisputed Facts, ¶ 31).

So, what were Plaintiffs' written directions to Caremark? Plaintiffs admit that they provided no unique processing instructions for the adjudication of government pharmacy claims, including DoD pharmacy claims. (Statement of Undisputed Facts, ¶ 32). In fact, Plaintiffs did not distinguish between government pharmacy claims (DoD, VA and IHS claims) and commercial pharmacy claims whatsoever when it came to processing claims. (*Id.* at ¶ 33). In the absence of any written instructions to the contrary, Caremark was entitled to – indeed, obligated to – process DoD pharmacy claims just like all other government pharmacy claims.

Caremark's treatment of these claims, moreover, was not a secret. The undisputed evidence in this case is that Caremark, through its plan design documents, unequivocally informed Coventry that it processed all government pharmacy claims – including DoD pharmacy

claims – as "in network" claims. (*Id.* at ¶ 34). In other words, consistent with the provisions of Section 1095, Caremark told Coventry that it was <u>not</u> going to use "network" status or lack of a participation agreement as a basis for denying claims filled at government pharmacies.

More specifically, the plan design documents during the relevant time period in this case contained the following disclosure language regarding the treatment of government pharmacy claims (including DoD claims):

> *All claims dispensed through federal facilities for Federal Health Insurance programs (such as Veteran Administration, Department of Defense, and Indian Health Services) and State Medicaid programs are treated as in-network claims.* *See* Exhibit 7 to Deposition of Peggy Davidson at CMK_0002634 (emphasis in original).

Coventry's own witnesses have confirmed that Coventry received, reviewed and approved all of the plan design documents containing this express disclosure about the treatment of DoD pharmacy claims. (Statement of Undisputed Facts, ¶ 35). And yet not once did Coventry either object to Caremark's treatment of these claims *or* instruct Caremark to process DoD claims differently. Coventry's failure to do so is telling – and fatal to its *post hoc* breach allegation.

In support of their claim that Caremark should have denied all DoD pharmacy claims as "out of network" when they were submitted on behalf of members who were part of an HMO plan, Coventry points to the so-called "HMO exception" for DoD pharmacy claims which is codified at 32 C.F.R. § 220.4(c)(3). The HMO exception, according to Coventry, permits a health maintenance organization ("HMO") to deny out-of-network claims in very specific circumstances – namely, claims for "routine" services that are provided within the "service area" of the HMO plan. Importantly, however, the language that appears in this section of the Code of Federal Regulations with respect to DoD claims does not appear in the equivalent regulations governing any other type of government pharmacy claim (i.e., VA claims and IHS claims).

While the parties dispute the meaning and scope of the so-called "HMO exception," this Court need not reach that issue in order to grant summary judgment to Caremark in this case.

Simply put, regardless of the meaning and scope of the HMO exception, Coventry never provided Caremark with written instructions on how to process any DoD claim, let alone a claim that might arguably have been subject to the HMO exception. It is also undisputed that Coventry did not even provide Caremark with the basic information Caremark would have needed to determine whether a pharmacy claim may fit within the HMO exception, such as the "service area" of the particular plan involved, or whether a particular plan was even an HMO. (Statement of Undisputed Facts, ¶ 36). Therefore, regardless of whether the HMO exception might have potentially applied to some number of these DoD claims, Coventry itself failed to avail itself of its provisions by specifically instructing Caremark in a manner that would have enabled Caremark to comply with the strict requirements of the regulation.

This is a breach of contract case. And yet, Plaintiffs have not identified a single provision of the contract which they contend Caremark breached. To the contrary, Coventry has been deliberately vague in its characterization of Caremark's alleged "breach." (*See, e.g.,* Complaint, ¶ 41, Exhibit 1 to Docket No. 1 stating that, "[i]n or about March 2009, Coventry discovered that Caremark had been paying DoD Pharmacy Claims that Caremark should not have been paying (the "Disputed DoD Pharmacy Claims."). Moreover, Plaintiffs have not taken issue with the manner in which Caremark processed any other type of government pharmacy claim apart from DoD claims. Coventry's failure to do so confirms what is obvious in this case, and what the undisputed evidence adduced during discovery has shown – Coventry either failed to, or chose not to, provide Caremark with the essential information and instructions that Caremark would have needed to process DoD claims *differently* than it processed all other

government pharmacy claims. Having failed to do so, Coventry cannot now contend that Caremark "breached" the contract.[3]

The fact that special processing instructions would have been required in order to process DoD claims as Coventry now suggests they should have been processed is best evidenced by communications between Coventry and its current PBM, Medco. Ms. Alicia Palmer, Coventry's in-house counsel, testified regarding her discussions with Medco regarding DoD pharmacy claims processing and stated as follows:

> Q (Caremark Counsel): Have you had any conversations with anyone at Medco regarding the processing of DoD pharmacy claims in general?
>
> A (A. Palmer): Conversations with anyone at Medco, yes.
>
> Q: When did you have those discussions?
>
> A: November of 2009.
>
> Q: Tell me what you recall about those discussions.
>
> A: We had a conference call with people at Medco and people at Coventry about how Medco was going to process DoD pharmacy claims.
>
> Q: Tell me everything you can recall about that conversation.
>
> A: We asked them how they processed DOD pharmacy claims with respect to the Coventry health plans, or how they were planning to. It was before they actually took over the commercial processing. They indicated in the conversation, the telephone conversation, that the

---

[3] After they filed the instant lawsuit, Plaintiffs, for the first time, suggested that these DoD pharmacy claims should have been denied in the ordinary course because they were "paper claims from an out-of-network pharmacy and, accordingly, subject to regular rules for processing paper claims submitted more than thirty days after a member's enrollment." (Statement of Undisputed Facts at ¶ 37). In sum, Plaintiffs now contend that all government pharmacy claims should have been denied as "out of network" unless they were (1) within the first thirty (30) days of a member's enrollment in the plan; or (2) for emergent or urgent claims. (*Id.* at ¶ 38). The fundamental flaw in this argument, however, is that these instructions would have resulted in the denial of essentially <u>all</u> government pharmacy claims based on the lack of a participation agreement with Coventry – and such a result would have been *per se* unlawful under federal regulations including 32 C.F.R. § 220.3(c)(4). Accordingly, Coventry's belated attempt to identify some "written direction" for the processing of DoD claims is unavailing as a matter of law.

DoD pharmacies were in their network, that they had agreements with them and, therefore, they would process and pay them based on the terms of their agreements. And we asked them if the- they were aware of and understood, and I don't remember the exact citation, but to the federal regulation allowing HMOs to deny out-of-network claims to DoD pharmacies and they said yes. We then said, if at any time the pharmacies, military pharmacies, the DoD pharmacies, excuse me, would become noncontracted that they agreed for certain plan benefit designs, we would expect them to reject those claims, and they expressed that if that happened they would notify us and we would have to set up an exchange of information so those plans could be identified . . . ."

(Palmer Deposition at 55:6-56:16, Exhibit 8 to Undisputed Statement of Facts.)

Later, however, Ms. Palmer clarified that the issue of a specific non-contracted DoD pharmacy had been discussed with Medco. She described the resolution of that issue as follows:

Q (Caremark Counsel): Do you know whether Medco has contracts with all military treatment facilities?

A: My understanding from Medco's response to our emails is that they do not have a contract with a Coast Guard facility.

Q: Do you know how Medco plans to process claims submitted by noncontracted military treatment facilities?

\* \* \*

A: In the email from Medco they indicated that they would process the Coast Guard at the same terms and conditions of their participating contracts with the other military branches.

Q: Isn't it true that Medco indicated that it would process those claims as in-network claims?

A: I'd have to see the email again to see if that's how they phrased it, but that would be my understanding of what I just said, yes.

Q: Did you or anyone else at Coventry ever object to the processing of Coast Guard claims in that fashion by Medco?

A: Not to my knowledge.

\* \* \*

4014473.10

> Q: Did you ever tell Medco that they should deny those claims as out-of-network claims based on the HMO exception set forth in the regulation you had previously mentioned to them?
>
> A: And when you say those claims, you're referring to the Coast Guard claims?
>
> Q: Correct.
>
> A: No, I did not.
>
> (Palmer Deposition at 101:22-103:14, Exhibit 8 to Undisputed Statement of Facts.)

The email string repeatedly referred to in the deposition testimony above sheds further light on Medco's position regarding the special processing of DoD pharmacy claims. According to Coventry, it constitutes the sole written instruction from Coventry to Medco concerning DoD pharmacy claims processing. (Statement of Undisputed Facts, ¶ 39.) The relevant email, which consists of a summary of a teleconference between Coventry and Medco written by Ms. Alicia Palmer and modified with subsequent comments by Ms. Elizabeth Ferguson of Medco (whose comments are underlined below), states in relevant part that:

> DOD - Medco currently has participating pharmacy agreement(s) with all military treatment facility (i.e., military base) pharmacies. As a result, any claims that come in from those pharmacies for prescriptions dispensed to Coventry members will be processed as an in-network claims [sic] via the POS system. Medco currently has agreement(s) with military treatment facility (i.e. – military base) pharmacies under which all MTF pharmacies operated by the US DoD service branches (Army, Navy, and Air Force) are included in Coventry's commercial pharmacy network. We do not currently have a contract with the Coast Guard. They have one facility and we have not received any claims. If we did so, we have it set up as in network at the network rate for the other MTF pharmacies. This is also just for the commercial networks. These pharmacies are not in Medicare D and Medicaid networks. Medco agrees that if it did not have a contract with one or more military treatment facility ("MTF") pharmacies, the HMO exception set forth in 32 C.F.R. 220.4(c)(3) may apply. Medco will notify Coventry in the event that one or more such MTF pharmacies are or become non-participating, so that the parties can work together to identify what information Medco will need from Coventry so that Medco can

determine if the HMO exception is applicable for claims received from such non-participating MTF pharmacies. <u>Coventry would have to send us the HMO business in its own contract/group number. The install people can discuss further.</u>

(Exhibit 4 to the Palmer Deposition attached as Exhibit 8 to the Undisputed Statement of Facts.)

This email conclusively establishes that Coventry (1) understands that additional information[4] and coordination would be required in order for its PBM to apply the HMO exception; and (2) acquiesces in Medco's treatment of Coast Guard pharmacy claims as in-network, despite the fact that Medco has no participation agreement with Coventry (i.e. – they are by definition "out-of-network"). Coventry has provided Medco with the same instructions regarding paper claims as it previously provided to Caremark (i.e., that they should be denied unless they are submitted within 30 days of member enrollment or are for an emergency). (Statement of Undisputed Facts, ¶ 40). Despite Plaintiffs' claim in this lawsuit that those instructions were sufficient to allow Caremark to effectively apply the HMO exception as they interpret it, Alicia Palmer never protests in her email to Medco above that no further instruction should be necessary. Quite to the contrary, she admits that if a government pharmacy becomes non-participating, the parties will "work together to identify what information Medco will need from Coventry so that Medco can determine if the HMO exception is applicable." (*Id.* at ¶ 41). Far from contending that existing guidance provided to Medco is sufficient, Ms. Palmer concedes that additional information and collaboration will be required <u>just to determine if the HMO is applicable</u> - not to mention how it would be applied.

---

[4] For example, Alicia Palmer testified that her understanding from conversations with Medco was that in order for Medco to attempt to apply the HMO exception, Coventry "would have to tell Medco what plans qualify for the exception, and that would be . . . at the benefit plan level." Palmer Deposition at 114:24-115:2, Exhibit 8 to Statement of Undisputed Facts. This necessary information was never provided to Caremark. Giardina Deposition at 109:18-110:18, Exhibit 1 to Statement of Undisputed Facts.

4014473.10

Therefore, Plaintiffs' breach of contract claims are fatally undermined by the facts surrounding Coventry's current approach to Medco's processing of DoD claims -- which is nearly identical to Caremark's prior approach. Coventry's *post hoc* argument to Caremark and this Court that the "regular rules" governing paper claims should have been applied to DOD pharmacy claims is nothing more than an attempt at Monday-morning quarterbacking in an effort to take money from Caremark after terminating its relationship with its prior PBM. Moreover, Coventry's argument must fail because had its alleged "regular rules" been applied as Coventry now demands, Caremark would have violated the law in breach of its contractual obligations to Plaintiffs. As a result, such instructions do not support a breach of contract claim against Caremark.

**B)** **In The Alternative, Plaintiffs Waived Any Breach Of Contract Claim Arising From The HMO Exception Because They Were Aware Of Caremark's Treatment Of Government Claims As "In Network" And Failed To Object.**

Even if Plaintiffs had given Caremark sufficient information and instruction on the processing of DoD pharmacy claims (which they did not), Plaintiffs waived any argument they may have had pursuant to the HMO exception by their knowledge of and failure to object to Caremark's processing of DoD pharmacy claims as "in-network." Waiver is defined under Maryland law as "the intentional relinquishment of a known right." *Taylor v. Mandel*, 935 A.2d 671, 686 (Md. 2007). "The right or advantage waived must be known; '[t]he general rule is that there can be no waiver unless the person against whom the waiver is claimed had full knowledge of his rights, and of facts which will enable him to take effectual action for the enforcement of such rights.'" *Id.* at 687 (quoting *Armour Fertilizer Works v. Brown*, 44 A.2d 753, 755 (Md. 1945)).

In this case, Plaintiffs have admitted that they never objected to Caremark's processing of DoD pharmacy claims prior to March 2009. (Statement of Undisputed Facts, ¶ 42). Yet, Shawn Burke, who is a Regional Vice President of Pharmacy Services[5], testified to her knowledge of Caremark's methods of processing certain DoD pharmacy claims as "in-network" beginning in 2007. (*Id.* at ¶ 43). Ms. Burke also testified that she had no recollection of objecting or instructing Caremark to process them otherwise despite being the Coventry representative charged with finalizing the plan design documents in question. (*Id.* at ¶ 44).

Moreover, Jim Giardina, one of Plaintiffs' 30(b)(6) representatives, testified that through a Mutual of Omaha plan design document dated December 2007, Coventry instructed Caremark to process all claims dispensed through federal pharmacies for federal health insurance programs (such as DoD) as in-network claims for that plan. (Statement of Undisputed Facts at ¶ 48). Lastly, Larry Blandford, the former manager of the Coventry account from 2005 through December 2008, provided uncontroverted testimony that, at the time that Plaintiffs converted to Caremark's network (either summer 2007 or 2008 per Mr. Blandford), he, Chris Risher and Danny Pagnillo on behalf of Caremark informed Michael Rothrock and possibly Maria Scalise of Coventry that Caremark processed and paid DoD pharmacy claims. (*Id.* at ¶ 49). Mr. Blandford further testified that he did not recall Plaintiffs raising any issue with Caremark's DoD claims processing at that time and that it would have been his role to get involved if Plaintiffs had any objections. (*Id.* at ¶ 50).

The fact that Coventry was aware of the way in which Caremark was processing DoD pharmacy claims and did not object until March 2009 constitutes a waiver of any rights allegedly

---

[5] Ms. Burke also testified that the plans for which she had responsibility in 2007 would have included Plaintiff Altius Health Plans. (Statement of Undisputed Facts, ¶ 45). Altius claims account for the vast majority of DoD pharmacy claims at issue. (Statement of Undisputed Facts, ¶ 46). In addition, Peggy Davidson, a former Coventry representative, testified that Shawn Burke would have been the individual responsible for finalizing plan design documents on behalf of Coventry in 2007. (Statement of Undisputed Facts, ¶ 47).

arising from the HMO exception.  In addition, the fact that Coventry is permitting its current PBM to process out-of-network government pharmacy claims (specifically Coast Guard pharmacy claims) in the identical way that Caremark processed them (i.e., as though they were "in network") is further evidence that Plaintiffs both understood and consented to Caremark's treatment of DoD claims.

### C) **Plaintiffs' claim for a declaratory judgment as to the processing of DoD pharmacy claims is moot.**

The Declaratory Judgment Act states in pertinent part that, "[i]n a case of actual controversy within its jurisdiction, . . .  any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  In this case, there is no "actual controversy" before this Court and Plaintiffs' declaratory judgment claim should be dismissed.  In determining the existence of jurisdiction in declaratory actions, "the actual controversy must be extant at all stages of review, not merely at the time the complaint is filed," and the burden is on claimant to "establish that jurisdiction over its declaratory judgment action existed at, and has continued since, the time [of filing]." *Harris Corp. v. Federal Express Corp.*, 670 F.Supp.2d 1306, 1309 (M.D. Fl. 2009) (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995) (internal quotations omitted)).

Likewise, the U.S. Supreme Court found in *Golden v. Zwickler*, that the question in deciding whether to dismiss Declaratory Judgment Act claims "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy any [sic] reality to warrant the issuance of a declaratory judgment."  394 U.S. 103, 108 (1969) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  In *Golden*, a distributor of political handbills sought

a declaratory judgment that a state statute making it a crime to distribute anonymous literature in connection with elections was unconstitutional and void. The Supreme Court held that the controversy was not of "sufficient immediacy and reality" to warrant issuance of declaratory judgment where the distributor/plaintiff appeared to be concerned only with handbills relating to a past election and a former Congressman who was no longer in office or seeking office. *Id.* at 109-110. Despite the fact that an actual controversy may have existed at the time the Complaint was filed, the Court in *Golden* held that the declaratory judgment claim should have been dismissed by the district court and remanded the case for its dismissal. *Id.*

Here, the Plaintiffs have terminated their contract with Caremark since the Complaint was filed in September 2009. (Statement of Undisputed Facts, ¶ 51). As a result, Caremark has no ongoing contractual obligation to process Coventry's DoD pharmacy claims. (*Id.* at ¶ 52). Plaintiffs' Complaint makes clear that it seeks declaratory relief to "clarify and settle the legal relations at issue in this case and afford relied [sic] from the uncertainty, insecurity and controversy giving rise to this case." (Complaint, ¶ 69, Exhibit 1 to Docket No. 1.). Any declaratory judgment rendered at this stage in the proceedings, given the termination of the parties' contractual relationship, would amount to nothing more than an advisory opinion. There is no remaining "uncertainty, insecurity or controversy" the relief for which would not be available pursuant to Coventry's breach of contract allegation. As such, Plaintiffs' request for a declaratory judgment is moot and should be dismissed as a matter of law.

**D)** **Caremark is entitled to summary judgment on its counterclaim that Coventry wrongfully withheld payment due to Caremark.**

Section 14.2(a)(i) of the Agreement between the parties provides in part that "COVENTRY or PLAN shall be financially responsible for the payment of Prescription Benefit claims when processed in accordance with this Agreement." On or around November 2009,

Caremark submitted, pursuant to the Agreement, certain statements of account or invoices relating to Altius claims (the "Invoices") to Coventry. (*See* Counterclaim, ¶ 8, Docket No. 32; Plaintiffs' Response to Caremark's Counterclaim, ¶ 8, Docket No. 53 (admitting the facts in Caremark's Counterclaim, ¶ 8)). Section 14.2(a)(ii) of the MPDP Agreement provides in part that "COVENTRY or PLAN, as applicable, shall pay CAREMARK within five (5) business days from the date COVENTRY or PLAN, as applicable, receives such a statement of account from CAREMARK . . . ." It is not disputed that Coventry failed to pay Caremark in full within five (5) business days from the date Coventry received each of the Invoices. (*See* Counterclaim, ¶ 12, Docket No. 32; Plaintiffs' Response to Caremark's Counterclaim, ¶ 12, Docket No. 53 (admitting that "Coventry did not pay Caremark in full within five business days from the date Coventry received each of the Invoices.")). A balance owed by Coventry to Caremark remains outstanding in the amount of $438,805.80 as of December 16, 2010. (Statement of Undisputed Facts, ¶ 53).

In its discovery responses, Coventry stated that, in processing the Invoices, it "did not pay for drug benefit claims that were for DoD pharmacy claims. As stated in Coventry's complaint, the claims for DoD pharmacies were not paid in accordance with the MPDP Agreement." (*Id.* at ¶ 54). In other words, Coventry elected to withhold payment for the Invoices based on the issues raised in its complaint against Caremark. As shown above, Caremark properly processed DoD pharmacy claims under the Agreement and Plaintiffs' claims to the contrary should be dismissed. Coventry has admitted its ongoing withhold of payment to Caremark for the Invoices and it has no basis to support that withhold. (*Id.* at ¶ 55).

There is no contractual basis for self-help or withholding under the Agreement. The only provision on which Coventry relies in alleged support of the withhold is Section 14.2(a)(i). That Section states:

4014473.10

> COVENTRY or PLAN shall be financially responsible for the payment of Prescription Drug Benefit claims when processed in accordance with this Agreement. CAREMARK shall be financially responsible for errors in claims payments due solely to enrollment errors and Benefit Form Implementation errors attributable solely to CAREMARK.

Caremark has shown that its processing of DoD pharmacy claims as "in-network" was in accordance with the Agreement which required compliance with applicable laws and regulations. No "errors" were made as contemplated by Section 14.2(a)(i) nor can Plaintiffs point to "enrollment errors or Benefit Form Implementation errors attributable solely to Caremark" as required for Caremark to be held financially responsible.

For these reasons, Coventry's continued refusal to make payment to Caremark for the Invoices is improper and in breach of the Agreement. Section 14.3 of the Agreement states that: "In the event that one party fails to pay another party in accordance with the terms of this Agreement, a finance charge for past due amounts shall apply in an amount equal to one and one-half percent (1.5%) per month of the amount due, unless such rate exceed the maximum rate allowable by applicable law, in which case such amounts shall bear interest at the maximum legally allowable rate." Caremark is entitled to compensatory damages, pre-judgment interest and all applicable finance charges for Coventry's admitted failure to pay the Invoices submitted to Coventry by Caremark pursuant to the Agreement.

## CONCLUSION

For the above-stated reasons, Caremark requests that summary judgment be granted to it both with respect to Plaintiffs' breach of contract and declaratory judgment claims as well as Caremark's counterclaim.

4014473.10

Respectfully submitted,

/s/ Michael A. Gardner
Jennifer L. Weaver (#020142)
Sheila W. Sawyer (#026048)
Michael A. Gardner (#025398)
Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, TN 37219
(615) 244-6380

*Attorneys for Defendant*

## Certificate of Service

I hereby certify that a copy of the foregoing was served via the Court's ECF system and U.S. Mail, this 22nd day of December, 2010 upon the individuals listed below:

J. Scott Hickman
Sherrard & Roe, PLC
424 Church Street
Suite 2000
Nashville, TN  37219
shickman@sherrardroe.com

Michael Eidel
Amy C. Purcell
Fox Rothschild, LLP
2000 Market St., 20th Floor
Philadelphia, PA 19103-3222
meidel@foxrothschild.com
apurcell@foxrothschild.com

_/s/ Michael A. Gardner
**Attorney for Defendant**