# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| COVENTRY HEALTH CARE, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:09-cv-1009 |
| | ) | |
| v. | ) | Senior Judge Wiseman |
| | ) | Magistrate Judge Knowles |
| CAREMARK INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO CAREMARK'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs/counterclaim defendants, Coventry Health Care, Inc., et al., respectfully submit this brief in opposition to the motion for summary judgment of defendant/counterclaim plaintiff, Caremark, Inc. ("Caremark").[1]

## I.      INTRODUCTION

Caremark's motion for summary judgment is premised on a distortion of the plain language of the parties' written agreement, the selective mis-citation of evidence, and the wholesale disregard of key documents and testimony. Because the factual record contains disputed issues of material fact, the Court should deny Caremark's motion for summary judgment.

Coventry is a managed healthcare company that offers healthcare benefits through a network of participating providers. As with other managed care companies, a fundamental way that Coventry controls healthcare costs for its individual participants is by limiting coverage to its network of participating providers. Those providers agree to accept discounted rates of reimbursement. By agreeing to serve as Coventry's pharmacy benefits manager ("PBM") from

---

[1] With this Brief, Plaintiffs are also filing a Response to Caremark's Statement of Undisputed Facts, as well as a Notice of Filing attaching cited excerpts from deposition testimony, affidavits with exhibits, and responses to interrogatories, all of which are incorporated herein by reference.

1999 to 2009, Caremark undertook the responsibility of administering claims submitted by providers, consistent with the terms of its agreement with Coventry. While Caremark simply ignores this inescapable fact in its motion, its contract with Coventry, consistent with Coventry's business model, explicitly and specifically requires that Caremark only pay claims from *participating* providers. It is undisputed that Department of Defense ("DOD") pharmacies were *not* participating providers as defined in the written agreement. While Caremark chooses to ignore this fact, it is also undisputed that in 1999, at the very inception of the parties' relationship, Coventry provided written and oral direction to Caremark about the conditions under which claims from non-participating providers, which obviously included DOD pharmacies, could be paid. These claims from non-participating pharmacies, commonly called "paper claims," were only to be paid in emergency situations, or within thirty days of eligibility whether or not it was an emergency situation. These instructions from Coventry were and are completely consistent with the applicable statutes, regulations, and DOD claims handling manual, and Caremark does not and cannot dispute that fact.

Notwithstanding the plain language of the parties' agreement, and Coventry's instructions about how to pay "paper claims," Caremark argues in its motion that Coventry was supposed to provide Caremark with additional "written instructions" specifically not to pay DOD claims. When this dispute first arose in 2009, however, Caremark tellingly never made this argument. Instead, Caremark relied solely on the entirely different argument that it was required to pay these claims under the relevant statute applicable to members of the armed services. Even in making that different argument, Caremark completely ignored the effect of the applicable regulation (32 C.F.R 220.4) that permits HMOs to deny DOD and other military claims as out of network (except in emergency situations). Regardless of the post-hoc nature of its arguments, Caremark is wrong on the merits. Caremark's arguments are inconsistent with the plain

language of the agreement, the regulatory scheme upon which Caremark purports to rely, and Coventry's instructions on how to pay paper claims. In sum, had Caremark only paid those DOD claims in accordance with Coventry's instructions on how to pay paper claims and pursuant to the MPDP Agreement, Caremark (and Coventry) would have been in compliance with the applicable regulations.

Caremark's reliance on Coventry's relationship with Medco is another red herring. In an effort to support the argument that Caremark somehow needed further written instructions not to pay DOD claims, it points to Coventry's relationship with Caremark's successor, Medco. The undisputed fact – overlooked by Caremark in its motion – remains that Coventry pays DOD claims submitted by Medco because Medco, unlike Caremark, has a contractual relationship with DOD pharmacies, and Coventry has expressly agreed to treat those pharmacies as participating in its network. As the testimony of Coventry's witnesses makes clear, if any individual pharmacy decided not to participate in Medco's network and then sought payment, Medco would require certain additional information to ensure non-payment for the applicable Coventry plan. Unlike Medco, Caremark ignored the explicit provisions of the parties' written agreement, ignored Coventry's guidelines for paying paper claims, and unilaterally decided to pay DOD claims that it was not required by contract or law to pay.

Relying on an equally distorted account of the record, Caremark makes the alternative argument that, even if they breached the agreement, Coventry waived any right to object. Even assuming someone within Coventry learned at some point that Caremark had paid DOD claims, the law is quite clear that Caremark must show that Coventry "unequivocally" intended to waive its rights under the parties' agreement. Moreover, the agreement between the parties' prohibits such a waiver. As such, Caremark fails to meet this burden. As Coventry's witnesses have

testified, Coventry objected and withheld any outstanding payment, consistent with the parties' agreement, when Coventry discovered that Caremark was paying DOD claims.

In summary, the factual record relied upon by Caremark is saturated with disputed issues of material fact so that summary judgment is precluded. As Coventry demonstrates in this memorandum and supporting evidence, the disputed issues of material fact include:

a) Whether Caremark improperly paid DOD pharmacy claims because the parties' written agreement explicitly requires that Caremark only pay claims for reimbursement from "Participating Pharmacies," and DOD pharmacies indisputably were _never_ "Participating Pharmacies";

b) Where the applicable federal regulations (and, in particular 32 C.F.R. Section 220.4(b)(3)) explicitly provide that HMOs may deny claims from military facilities with whom the HMO does not have a participation agreement, whether Caremark nevertheless improperly paid DOD pharmacy claims on behalf of Coventry's HMO plans;

c) Where Coventry explicitly instructed Caremark, beginning in 1999, as to how to process "paper claims" (which _necessarily_ included DOD pharmacy claims), and Coventry's instructions were consistent with and did not violate federal law, whether Caremark breached the written agreement by paying DOD pharmacy claims contrary to those instructions;

d) Whether language in "plan design documents" relied upon by Caremark adequately gave notice to Coventry that Caremark was paying DOD pharmacy claims where: (i) the plan design documents relied upon relate to two Coventry health plans that are _not_ making claims in this case; (ii) the language relied upon by Caremark does not state that Caremark is treating DOD pharmacies as "in network" for _all_ Coventry plans; (iii) these plan design documents were not used by the parties for implementation of any of the other Plaintiff Health Plans, and most notably were not used for Altius which makes up the majority of Plaintiffs' claims here; (iv) Coventry expressly disputes Caremark's claim that Caremark discussed its intention to pay DOD pharmacy claims in 2007 or 2008; and (v) Caremark never raised this purported "notice" argument before this litigation was filed by Coventry;

e) Where the written agreement contains a "no waiver" provision, and there is no evidence that Coventry ever expressed an intention to waive its right to contest Caremark's payment of DOD pharmacy claims, whether Caremark can satisfy its high burden of establishing "waiver"; and

f) Whether Coventry properly withheld reimbursement to Caremark for its payment of DOD pharmacy claims where Caremark's payment of those claims was improper, and where the parties' written agreement expressly provides that Caremark should only

process claims from "Participating Pharmacies" and is only entitled to "Fees" for processing claims from such pharmacies.

Caremark's motion should be denied.

## II.   FACTUAL BACKGROUND

### A.   The Parties.

Coventry Health Care, Inc. ("CHC") is the parent company of several insurers and health maintenance organizations ("HMOs") (the "Health Plans" or "Plans") (CHC and the Health Plans collectively referred to as "Coventry" or "Plaintiffs").  See Complaint [Docket Entry No. 1] at ¶ 2.  Coventry offers healthcare benefits through a network of participating providers.  See Affidavit of James Giardina ("Giardina Aff."), which is attached to Plaintiffs' Notice of Filing as Exhibit "L", at ¶ 4.  Because participating providers agree to accept discounted rates of reimbursement, Coventry controls healthcare costs for members of its Health Plans by limiting coverage to its network of participating providers.  Id. at ¶ 5.

Caremark provides pharmacy benefit management services to sponsors of health benefit plans.  See Caremark's Statement of Uncontested Facts ("Caremark's Facts") at ¶ 1. Specifically, Caremark provides claims processing services including, but not limited to, processing claims from pharmacies, administering benefits and providing customer service to members of health plans.  See Deposition of James Giardina ("Giardina Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "F", at 12:24-13:10.

### B.   The Managed Prescription Drug Program Agreement.

In July of 1999, Coventry and Caremark entered into the Managed Prescription Drug Program Agreement (which the parties amended in July of 2006) (collectively, the "MPDP Agreement" or the "Agreement").  See Caremark's Facts at ¶¶ 7, 9.  Under the MPDP Agreement, Caremark provided pharmacy benefit management services for Coventry.  Id. at ¶¶ 5, 10. As Coventry's manager of pharmacy benefits, Caremark processed "millions of pharmacy

claims on Coventry's behalf." <u>See</u> Caremark's Facts at ¶ 13. These claims invariably included "covered" and "non-covered" claims. A "subset" of these claims came from pharmacies operated by federal government agencies including, but not limited to, the Department of Defense ("DOD Claims"). <u>Id.</u> at ¶¶ 11, 13.

DOD Claims occur when a Health Plan member or a member of his of her family is a member of the military and fills a prescription at a pharmacy located on a military base or other DOD facility (a "DOD Pharmacy"). <u>See</u> Complaint at ¶ 37. After the member fills his or her prescription, the DOD submitted a claim for reimbursement to Caremark, as the manager of Coventry's prescription plans. <u>Id.</u> at ¶ 38. It was Caremark's contractual responsibility to pay <u>only</u> those DOD Claims that are eligible for payment. <u>Id.</u> at ¶ 39. Pursuant to the MPDP Agreement, after Caremark processed and paid DOD Claims, Caremark invoiced Coventry so that Coventry could reimburse Caremark for the DOD Pharmacy Claims that Caremark paid on Coventry's behalf. <u>Id.</u> at ¶ 39.

          **1.**     **<u>"Participating Pharmacies" Versus "Non-Participating Pharmacies."</u>**

Immediately, the MPDP Agreement expressly distinguishes between "Participating Pharmacies" and "Non-Participating Pharmacies". <u>See</u> MPDP Agreement, which is attached to Caremark's Statement of Uncontested Facts at Exhibit "3", at § 1. Section 1 ("Definitions") of the MPDP Agreement states that "'Participating Pharmacy' shall mean a pharmacy which has entered into an agreement with CAREMARK, COVENTRY or a PLAN to provide prescription drug services to individuals designated by CAREMARK, COVENTRY or a PLAN, as applicable." <u>Id.</u> In contrast, "'Non-Participating Pharmacy' shall mean any pharmacy that does not have an agreement with CAREMARK, COVENTRY or a PLAN to provide services to Covered Individuals." <u>Id.</u> Section 1 of the MPDP Agreement also defines a "CAREMARK Participating Pharmacy" as a "pharmacy which has entered into an agreement with

CAREMARK to provide prescription drug services to those individuals designated from time to time by CAREMARK." <u>Id.</u> Similarly, under Section 1 of the MPDP Agreement, a "'COVENTRY Participating Pharmacy' shall mean a pharmacy which has entered into an agreement with COVENTRY or PLAN [a Coventry Health Plan] to provide prescription drug services to Covered Individuals." <u>Id.</u>

2. <u>Services Provided To Participating Pharmacies</u>.

> Section 6.3 (a) ("Services") of the MPDP Agreement provides, in pertinent part: Pursuant to the terms of the Transition Schedule and for the term of this Agreement, CAREMARK shall provide the following services <u>to the COVENTRY Participating Pharmacy Network</u>:  (i) claims processing services set forth in this Agreement; . . . (iii) reimbursement to the pharmacies in accordance with Section 14.2(a)(iii) hereof . . . .

<u>See</u> MPDP Agreement at Section 6.3(a) (emphasis added).  In addition, Section 6.1(a) required Caremark to "maintain and make available for the term of this Agreement a network of CAREMARK Participating Pharmacies which shall be accessible to Covered Individuals who are unable to obtain covered drugs from COVENTRY Participating Pharmacies." <u>Id.</u> at § 6.1(a). Accordingly, the Agreement indisputably provides that Caremark was only supposed to perform claims processing services for "Participating Pharmacies."  DOD Pharmacies, indisputably, were *not* Participating Pharmacies.

Moreover, the MPDP Agreement clearly and unambiguously provides that Coventry is required to pay fees to Caremark only for claims processed from Participating Pharmacies. Section 13.1(a) ("Fees") provides, in pertinent part:

> COVENTRY and COVENTRY HEALTH PLANS agree to pay the fees set forth in <u>Exhibit E</u> attached hereto for the Managed Prescription Drug Program services provided by CAREMARK hereunder.
>
> * * *
>
> Unless otherwise agreed to by COVENTRY, CAREMARK shall not charge COVENTRY or COVENTRY HEALTH PLANS for Managed Prescription Drug Program services provided in accordance with this Agreement <u>except as set forth on Exhibit E</u>.

<u>Id.</u> at § 13.1(a) (emphasis added). Exhibit E ("Fees") states that "COVENTRY or PLAN shall pay CAREMARK for prescriptions and covered supplies <u>dispensed by COVENTRY Participating Pharmacies</u> in an amount equal to applicable contracted fee schedules for COVENTRY Participating Pharmacies as provided by COVENTRY to CAREMARK prior to the execution of this Agreement and updated from time to time." <u>Id.</u> at Exhibit E (emphasis added). Exhibit E also sets forth a pricing mechanism that expressly describes the rate at which "COVENTRY or PLAN shall pay CAREMARK for prescriptions and covered supplies <u>dispensed by CAREMARK Participating Pharmacies</u> to Covered Individuals." <u>Id.</u> at Exhibit E (emphasis added).

Similar to Exhibit E, Exhibit D to the Amendment to the MPDP Agreement (entitled "Fees") states that "[c]laims for Covered Services <u>submitted by COVENTRY Participating Pharmacies</u> shall be paid at the rates set forth in the contract between COVENTRY and the respective COVENTRY Participating Pharmacy as such rates are provided to Caremark by COVENTRY." <u>See</u> Amendment to MPDP Agreement, which is attached to Caremark's Statement of Uncontested Facts as Exhibit "4," at Exhibit D, § 1.2. Exhibit D also specifically describes how "[c]laims <u>submitted by Caremark Participating Pharmacies</u> shall be billed to COVENTRY." <u>Id.</u> Accordingly, the plain terms of the MPDP Agreement and the Amendment thereto *required* that Caremark only process claims from "Participating Pharmacies."

In addition, the MPDP Agreement stated that "COVENTRY or PLAN shall be financially responsible for the payment of Prescription Drug Benefit claims <u>when processed in accordance with this Agreement</u> [the MPDP Agreement]. <u>See</u> MPDP Agreement at § 14.2(a)(i) (emphasis added). Moreover, the MPDP Agreement and the Amendment to the MPDP Agreement provided that "COVENTRY and COVENTRY HEALTH PLANS shall have final discretionary authority with regard to the payment of any disputed claim, according to the

process and policies established and/or followed by COVENTRY and COVENTRY HEALTH PLANS." See MPDP Agreement at § 4.1(a); Amendment to MPDP Agreement at § 4.1(i).

Significantly, Section 19.1 of the MPDP Agreement states that the Agreement "may not be modified, amended, or changed except by a written agreement signed by the parties." See MPDP Agreement at § 19.1. Section 19.7 states:

> The failure of either party to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or a relinquishment of any right or claim granted or arising hereunder or of the future performance of any such term, covenant, or condition, and such failure shall in no way affect the validity of this Agreement or the rights and obligations of the parties hereunder.

Id. at § 19.7.

### 3. DOD Pharmacies Were Not "Participating Pharmacies" Under The MPDP Agreement.

From 1999 until the MPDP Agreement terminated on December 31, 2009, neither Coventry nor any of the Health Plans entered into an agreement with the DOD. See Giardina Aff. at ¶ 6. DOD Pharmacies thus were not "Coventry Participating Pharmacies" under the terms of the MPDP Agreement. Id. The MPDP Agreement itself thus constituted Coventry's written direction to Caremark, and Caremark's agreement, *not* to pay DOD Claims, except as explicitly directed otherwise.

With respect to "Caremark Participating Pharmacies," Lori Breslin ("Ms. Breslin"), Caremark's Strategic Account Executive, who was responsible for Plaintiffs' accounts beginning in approximately July, 2006, (who Caremark designated as its Rule 30(b)(6) corporate representative on the MPDP Agreement, as well as Caremark's procedures and information it relied upon for setting up the processing of DOD Claims) attempted to testify that Caremark's network actually included DOD Pharmacies. See Deposition of Lori Breslin ("Breslin Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "B", at 111:13-15. She later admitted,

however, that she was not aware of any agreement between Caremark and DOD Pharmacies. See Breslin Dep. at 219:1-13.[2]   In addition, when Caremark communicated to Plaintiffs a list of pharmacies that were "in-network" (i.e. the "Participating Pharmacies"), DOD Pharmacies were not included on that list.  See Giardina Aff. at ¶ 7.  Ms. Breslin conceded that she never saw this "list" of pharmacies, and that she had "assumed" erroneously that DOD Pharmacies were on that list.  See Breslin Dep. at 126:2-11; 127:12-20.  DOD Pharmacies therefore were not "Caremark Participating Pharmacies" under the definitions stated in the MPDP Agreement.  See Giardina Aff. at ¶ 8.  Because neither Coventry, its Health Plans, nor Caremark had agreements with the DOD Pharmacies, the DOD Pharmacies were not "Participating Pharmacies," but rather were "Non-Participating Pharmacies," under the MPDP Agreement.

One consequence of the DOD Pharmacies not being "Participating Pharmacies" was that they could not submit a claim to Caremark electronically.  See Giardina Aff. at ¶ 9.  Instead, when a member filled a prescription at a DOD Pharmacy, the pharmacy submitted a "paper claim" to Caremark.  Id. at ¶ 10.  As such, all DOD Claims were paper claims.  Id. at ¶ 11; Giardina Dep. at 90:25-91:4.

### C.   Written Guidance To Caremark For Processing Paper Claims.

In addition to the instructions set forth in the MPDP Agreement, which required Caremark to pay claims submitted only by Participating Pharmacies, Plaintiffs provided written guidance to Caremark for the processing of "paper claims."  See Giardina Dep. at 116:16-19; Giardina Aff. at ¶ 12.  In August of 1999 (approximately one month after the parties entered into the MPDP Agreement), Caremark contacted Coventry and asked that Coventry provide it with further direction regarding processing paper claims.  See Giardina Aff. at ¶ 13 and Exhibit 1.

---

[2] Ms. Breslin's lack of knowledge on this point is only one of many examples were she was not prepared to address a specific topic.  Accordingly, Plaintiffs filed a motion for leave to file a motion to compel Caremark to produce a Rule 30(b)(6) representative to testify as to those topics about which Ms. Breslin was not adequately prepared to address.  See Docket Entry No. 74.

Coventry responded to Caremark's request and provided Caremark with "exception criteria" for the processing of paper claims, i.e., those instances in which Caremark should pay a paper claim. Id.  The "exception criteria" were limited to the following:  (1) claims otherwise eligible for reimbursement submitted within thirty (30) days of the member's enrollment; and (2) claims for medications associated with an emergency.[3]  Id.

These instructions from Coventry applied to all paper claims submitted by members who did not have an "out-of-network" benefit.  See Deposition of Shawn Burke ("Burke Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "C", at 44:21-45:10.  Coventry has never disputed that *some* prescription benefit plans of the Health Plans provide out-of-network benefits to their members, however, claims paid under those Plans with out-of-network benefits are not included in Coventry's calculation of damages in this case.  See Plaintiffs' Amended Responses to Defendant's Second Set of Interrogatories, which are attached to Plaintiffs' Notice of Filing as Exhibit "P", at ¶¶ 1, 8; See also Deposition of Ryan Rowley ("Rowley Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "J", at 25:7-21 and 32:14-25.  If a member's benefit plan had an out-of-network benefit, then Caremark paid a paper claim according to that benefit.  See Burke Dep. at 36:10-15.  Although the majority of plans did not provide out-of-network benefits,[4]  Coventry identified for Caremark those plans that had out-of-network benefits.  Id. at 36:19-37:2; 37:3-23.

---

[3] Coventry also stated that a paper claim may be paid only if submitted within six (6) months of the date of service.  See Giardina Aff. at Exhibit 1.  Because this criteria has not been an issue in this case, Plaintiffs mention it only for the sake of completeness.

[4] Typically, PPO plans offer "out-of-network" benefits, while HMO plans are restricted to a limited network.  See Burke Dep. at 17:5-24.  When Coventry and Caremark entered into the MPDP Agreement, the majority of members under the Health Plans had HMO plans.  In fact, Altius Health Plans, Inc. ("Altius"), the key subsidiary Health Plan at issue in this case, never offered any PPO plans to its members.  See Deposition of Brett Clay ("Clay Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "D", at 20:22-21:1; 21:11-18; 24:14-16; see Deposition of Frank Kyle "Kyle Dep.", which is attached to Plaintiffs' Notice of Filing as Exhibit "G", at 16:19-22.

### D.     **Plan Design Documents And Matrices**.

In addition to specific contractual requirements for the types of claims Caremark should process, each time that Caremark implemented a new plan for one of the Health Plans, discovery has shown that Caremark would prepare documents to outline how it intended to process claims under that plan. See Deposition of Keith Rehrer ("Rehrer Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "I", at 19:18-20:2; 27:2-10; 64:17-23. These documents typically took one of two forms. As Keith Rehrer, Caremark's Implementation Manager, testified, when Caremark implemented a small number of new plans, it utilized "plan design documents." See Rehrer Dep. at 57:7-14; 58:9-21. However, when Caremark implemented a large number of new plans at the same time, such as the implementation that Caremark conducted when Coventry transitioned Altius to Caremark after Coventry purchased Altius, it used a "matrix". Id.; see also 59:6-8. No matrix produced in this litigation has ever mentioned, much less provided the necessary authorization to Caremark to pay all DOD Claims.

### E.     **Coventry Discovers A Sudden "Spike" In Paper Claims**.

That Coventry did not knowingly agree to Caremark's payment of DOD Claims is clear from the record. In early March of 2009, Coventry's Altius Health Plan discovered for the first time that Caremark was paying DOD claims, instead of denying them as Plaintiffs had instructed Caremark. See Clay Dep. at 51:9-13. Specifically, Altius noticed an unusual "spike" in the number of pharmacy claims that Caremark had paid on behalf of Altius. Id. Upon further investigation, Altius learned that there was a large volume of "aged claims" going back to 2007. Id. at 51:1-16. These claims were not submitted electronically, but were "paper claims." Id. at 51:14-19. After reviewing the data from the Caremark system for these paper claims, Altius discovered that they were claims from DOD Pharmacies. Id. at 51:20-25. Coventry immediately raised this issue with Caremark and asked Caremark to explain why it had paid such a large

volume of paper claims, going back two years, from DOD Pharmacies and, why Caremark paid DOD Claims at all. Id. at 56:13-20.[5]

In response to Coventry's inquiries, despite all of the arguments that Caremark now proffers, Caremark's initial response (two months after Coventry first raised the issue with Caremark) stated that Caremark would revise its system to "reject" any claims from DOD Pharmacies. See Affidavit of Alicia Palmer ("Palmer Aff."), which is attached to Plaintiffs' Notice of Filing as Exhibit "M", at ¶ 6. Shortly after that, Caremark changed its tune and stated that it paid DOD Claims because it was purportedly required to do so by law. Id. at ¶ 8. Caremark never contended, as it does now, that it had previously informed Coventry that it was paying DOD Claims.

**F.    Coventry Institutes This Action To Recoup Monies That Caremark Wrongfully Paid On Behalf Of Coventry.**

After months of communications back and forth between the parties, Coventry and the Health Plans instituted this action in September of 2009. In its Complaint, Plaintiffs stated that DOD claims should have been denied by Caremark rather than paid and billed to Coventry. See Complaint. The Complaint provides that, according to the relevant regulations, HMOs like Plaintiffs, "may exclude from coverage non-emergency or non-urgent, out-of-network services, such as DOD Pharmacy Claims." Id. at ¶ 44. The Complaint further states " . . . these out-of-network DOD Pharmacy Claims are not covered benefits and should not be paid on Coventry's behalf by Caremark." Id. at ¶ 45. Plaintiffs seek to recoup between $600,000 and $1,000,000, the amount of wrongfully paid claims for which they have already paid Caremark. Id.

---

[5] Coventry has confronted Caremark at least twice in the past about incorrect processing of other government claims immediately upon Coventry's discovery of Caremark's mistakes. See Giardina Aff. at ¶ 18. First, in approximately 2002, upon noticing a spike in claims, Coventry promptly investigated and then objected to Caremark's incorrect processing of certain Medicaid claims (resulting in Caremark agreeing to deny certain claims going forward). Id. Second, another piece of this litigation also dealt with Coventry's objection to Caremark's incorrect processing of Medicaid claims. Id.

In an effort to minimize its damages, Altius began to withhold payments to Caremark for DOD Claims that Altius believed should not have been paid by Caremark. See Caremark's Facts at ¶ 54. Altius withheld these payments under Sections 14.2(a)(i) and (ii) of the MPDP Agreement. See MPDP Agreement at § 14.2(a)(i) and (ii). Section 14.2(a)(i) states, in part that "COVENTRY or PLAN shall be financially responsible for the payment of Prescription Drug Benefit claims when processed in accordance with this Agreement [the MPDP Agreement]." Id. at § 14.2(a)(i). "Section 14.2(a)(ii) provides, in part that "[i]f COVENTRY or a PLAN disputes any item on the statement of account, COVENTRY or the PLAN shall state the amount in dispute in writing within thirty (30) days of the date of the statement of account." Id. at § 14.2(a)(ii). To date, Altius has withheld $223,898.63 from Caremark in connection with Caremark's improper processing of DOD Claims. See Affidavit of Brett Clay ("Clay Aff."), which is attached to Plaintiffs' Notice of Filing as Exhibit "K", at ¶ 9.

### G. The MPDP Agreement Terminates.

The MPDP Agreement terminated, by its own terms, on December 31, 2009. See Amendment to MPDP Agreement at § 2. At that time, Coventry (not the Health Plans) made the business decision not to renew the MPDP Agreement with Caremark. See Giardina Aff. at ¶ 19. As such, Caremark no longer processes pharmacy claims on behalf of Coventry.[6]

In or about January 1, 2010, Coventry entered into an agreement with a new pharmacy benefits manager, Medco, to process pharmacy claims on Coventry's behalf. Id. at ¶ 20. With the exception of one DOD agency, the Coast Guard, which Medco has indicated it does not receive any claims from, Medco, unlike Caremark, has agreements with all DOD Pharmacies. Id. at ¶ 21. As a result, DOD Pharmacies are in Medco's network and Medco pays DOD Claims that it receives from members of Coventry Health Plans. Id.

---

[6] Because the MPDP Agreement has terminated, Plaintiffs do not dispute Caremark's statement in its motion for summary judgment that Plaintiffs' claim for declaratory relief is moot.

## III.  LEGAL ARGUMENT

### A.  The Court Should Deny Caremark's Motion For Summary Judgment.

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a mater of law."  Fed. R. Civ. P. 56(a).  In order to prevail on a motion for summary judgment, "the moving party must establish the absence of a genuine issue of material fact as to an essential element of the opposing party's claims."  Cary v. Kroger Co., Inc., 2010 WL 3420351, at *3 (M.D.Tenn. Aug. 26, 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  In deciding a motion for summary judgment, "[t]he Court's function is not to weigh the evidence, but to draw all reasonable factual inferences in the light most favorable to the non-moving party and determine if there is a genuine issue of material fact for trial."  Cary, 2010 WL 3420351, at *3 (M.D.Tenn. Aug. 26, 2010) (citations omitted); Beal v. Walgreen Co., 2010 WL 4669905, at *2 (6th Cir. Nov. 10, 2010) ("the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party").  Issues of material fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  Moreover, with respect to a motion for summary judgment, a court "will closely scrutinize the movant's papers while indulgently treating those of the opponent."  Reynolds v. Schwarz, 2010 WL 3239296, at *2 (M.D.Tenn. Aug. 16, 2010) (citing Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962).  Here, because there is a genuine dispute as to material facts based on the factual record -- including the

parties' agreement and course of conduct -- the Court should deny Caremark's motion for summary judgment as to Plaintiffs' Complaint and Caremark's Counterclaim.[7]

      **B.**      **Caremark Breached The MPDP Agreement**.

As noted previously, the positions raised by Caremark are in several respects different in substance from those raised by Caremark when this dispute arose. For the first time, Caremark argues that it satisfied its obligations under the MPDP Agreement because Coventry failed to provide it with written instructions not to pay DOD Claims. Caremark continues to argue that it did not breach the MPDP Agreement because it had to pay DOD Claims under the law. Both of these arguments are meritless.

      **1.**      **Caremark Did Not Process DOD Claims In Accordance With The Express Terms Of The MPDP Agreement**.

Caremark contends that it satisfied its contractual obligations under the MPDP Agreement. <u>See</u> Caremark's Brief at p. 7. This contention, of course, ignores the fact that Caremark violated the express terms of the MPDP Agreement that direct Caremark to process only those claims from Participating Pharmacies.

As discussed above, throughout the term of the MPDP Agreement, DOD Pharmacies were <u>*not*</u> "Participating Pharmacies," "Coventry Participating Pharmacies," or "Caremark Participating Pharmacies," which by definition made them Non-Participating Pharmacies. <u>See</u> Giardina Aff. at ¶¶ 6, 8. Nowhere in the MPDP Agreement or the Amendment to the MPDP Agreement is there any direction whatsoever to pay claims submitted by Non-Participating Pharmacies. <u>See</u> MPDP Agreement. Because Caremark paid claims from DOD Pharmacies, Caremark breached the terms of the MPDP Agreement.

---

[7] Because the MPDP Agreement has terminated, Plaintiffs do not dispute Caremark's statement in its motion for summary judgment that Plaintiffs' claim for declaratory relief is moot.

2. **Caremark Did Not Process DOD Claims In Accordance With The Explicit Instructions That Coventry Provided To Caremark**.

The implausible manner in which Caremark seeks to avoid the language in the MPDP Agreement further highlights the lack of merit in Caremark's overall position. Caremark contends that Plaintiffs did not provide "unique" processing instructions for the adjudication of government pharmacy claims, including DOD Claims. See Caremark's Brief at p. 8. Caremark further alleges that, when processing claims, Plaintiffs "did not distinguish" between government pharmacy claims and commercial pharmacy claims. Id. Neither of these positions is supportable.

In addition to the express language of the parties' contract discussed above, contrary to Caremark's position, Plaintiffs did provide Caremark with explicit instructions about how to process "paper claims." See Giardina Dep. at 116:16-19. Specifically, in August of 1999 (approximately one month after the parties entered into the MPDP Agreement), Coventry provided Caremark with "exception criteria" for paper claims, in other words, those limited instances in which Caremark should pay a paper claim. See Giardina Aff. at ¶ 13; Exhibit 1. The "exception criteria" included only the following: (1) otherwise eligible claims submitted within thirty (30) days of the member's enrollment; and (2) claims for medications associated with an emergency. Id. Because all DOD Claims are paper claims, these instructions told Caremark exactly how Plaintiffs expected it to process DOD Claims. Further, in response to Caremark's second argument, because Coventry provided Caremark with special "exception criteria" for paper claims only, Coventry did in fact distinguish between processing government claims and processing commercial claims.

Moreover, the MPDP Agreement required Caremark to comply with " . . . the process and policies established and/or followed by COVENTRY and COVENTRY HEALTH PLANS." See MPDP Agreement at § 4.1(a); Amendment to MPDP Agreement at § 4.1(i). By paying all

DOD Claims instead of only paying those DOD Claims that fit the "exception criteria," Caremark did not comply with "the process and policies established and/or followed by COVENTRY and COVENTRY HEALTH PLANS." As a result, Caremark has breached the MPDP Agreement.

Caremark has attempted to claim that Coventry never provided Caremark with "the basic information Caremark would have needed to determine whether a pharmacy may fit with the HMO Exception, such as the 'service area' of the particular plan involved, or whether a particular plan was even an HMO." See Caremark's Brief at p. 10. In fact, however, the record shows that, when deciding whether to pay or deny a pharmacy claim, Caremark did not need to know the "service area." See Giardina Dep. at 160:6-22; Giardina Aff. at ¶ 14. Similarly, Caremark's witnesses admitted that "it would not make a difference" for payment purposes whether any particular plan was an HMO. See Breslin Dep. at 57:2-11; 60:16-23. Nonetheless, Coventry told Caremark which plans were HMOs in any event. See Giardina Dep. at 71:8-72:13; 85:9-21; Giardina Aff. at ¶ 15. And, each of Caremark's key witnesses testified that they knew Coventry had HMO plans. See Breslin Dep. At 58:9-59:1; 60:3-15, Deposition of Larry Blandford ("Blandford Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "A", at 33:6-11, Deposition of Mike Ford ("Ford Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "E", at 30:12-16. Accordingly, Caremark's position that no issue of material fact exists that would allow Plaintiffs to submit to the jury the issue of whether Caremark breached the parties' agreement is without merit, and its motion for summary judgment should be denied.

### 3. Caremark Did Not Process DOD Claims In Accordance With The Law.

Caremark alternatively argues that it processed DOD Claims as in-network because "denying a DOD Claim on the grounds that the military pharmacy was not in the plan's network of contracted pharmacies would violate federal law." See Caremark's Brief at p. 5. Caremark

521603.1_08639.001

alleges that 32 C.F.R. 220.3(c)(4) prohibits Plaintiffs from denying a claim from a DOD Pharmacy based on the fact that the pharmacy does not have a "participation agreement" with Coventry and/or Caremark.  Id. at 8.  In support of this argument, Caremark also relies upon 32 C.F.R. § 220.3(b)(3), which states that "[t]hird party payers may not treat claims arising from services provided in facilities of the uniformed services less favorably than they treat claims arising from services in other hospitals."  Id. at 4.  Caremark's interpretation of these laws is unduly selective, wrong, and inevitably fatal to its motion for summary judgment.

Under the federal statute, the DOD may indeed seek reimbursement from health plans, when it paid for a prescription on behalf of a beneficiary with private prescription drug coverage. See 10 U.S.C. § 1095(a)(1).  However, 32 C.F.R. 220.4 (which is part of the regulation that implements 10 U.S.C. § 1095) states that "[t]he statutory obligation of the third party to pay is not unqualified."  See 32 C.F.R. 220.4(a).  The regulations also state:

> Based on the statutory requirement, after any impermissible exclusions have been made inoperative (see § 220.3 of this part), reasonable terms and conditions of the third party payer's plan that apply generally and uniformly to services provided in facilities other than facilities of the uniformed services may also be applied to services provided in facilities of the uniformed services.

See 32 C.F.R. 220.4(b).  The regulations also state that ". . . [t]hird party payers are not required to treat claims arising from services provided in or through facilities of the Uniformed Services more favorably than they treat claims arising from services provided in other facilities or by other health care providers."  See 32 C.F.R. § 220.4(b)(2) (emphasis added).  Finally, the regulations provide "specific examples of permissible terms and conditions," such as the following:

> Restrictions in HMO plans.  Generally applicable exclusions in Health Maintenance Organization (HMO) plans of non-emergency or non-urgent services provided outside the HMO (or similar exclusions) are permissible.  However, HMOs may not exclude claims or refuse to certify emergent and urgent services provided within the HMO's service area or otherwise covered non-emergency services provided out of the HMO's service area.  In addition, opt-out or point-of-

service options available under an HMO plan may not exclude services otherwise payable under 10 U.S.C. 1095 or this part.

See 32 C.F.R. § 220.4(c)(3) (the "HMO Exception") (emphasis added). Similarly, the Military Treatment Facility Uniform Business Office Manual also states that an "HMO" constitutes a "valid denial" for claims from Military Treatment Facilities. See Military Treatment Facility Uniform Business Office Manual.[8]

These laws clearly do not require Caremark to process all DOD claims as "in-network." Instead, these regulations permit Caremark to deny DOD pharmacy claims in HMO plans because DOD Pharmacies are not Participating Pharmacies. See Kyle Dep. at 41:3-22; 65:25-66:9; Deposition of Doug Porter ("Porter Dep."), which is attached to Plaintiffs' Notice of Filing as Exhibit "H", at 47:3-6. Thus, Caremark's "material fact" in its motion that it paid DOD Claims in accordance with the law is not only disputed, it is patently incorrect.

Moreover, Caremark's contention that it processed DOD claims as "in-network" "to comply with these regulations" is not supported by the record. Caremark's witnesses (including Caremark individuals who played an integral role in the relationship between Coventry and Caremark) testified either that they never even saw these regulations until this dispute arose between the parties in early 2009, or that they never saw them at all. See Breslin Dep. at 79:7-20; 83:6-19; Ford Dep. at 41:25-42:10.

Caremark alleges that "the court need not rule" on the meaning and scope of the HMO Exception in order to grant summary judgment in this case.[9] See Caremark's Brief at p. 2. At

---

[8] Because the MPDP Agreement has terminated, Plaintiffs do not dispute Caremark's statement in its motion for summary judgment that Plaintiffs' claim for declaratory relief is moot.

[9] Caremark's argument that an interpretation of the law is unnecessary to the disposition of this action is particularly surprising in light of Caremark's Response to Plaintiffs' Motion for Remand filed previously in this litigation. In that Response, Caremark argued that the Court should not remand this case to state court because "[t]he primary task before this Court is interpretation of the DoD statute and regulations, including the scope of the HMO exception relied upon by plaintiffs. . . . As such, this case presents a quintessential federal question." See

the same time, however, Caremark tacitly seeks a ruling that it paid claims in accordance with the law, thus satisfying its obligations under the MPDP Agreement. The parties obviously disagree about whether Caremark processed DOD Claims "in accordance with the law" as required by the MPDP Agreement, and as applied to the particular facts and circumstances present here. This creates a genuine mixed issue of material fact and law that precludes a grant of summary judgment. See Atalla v. Abdul-Baki, 976 F.2d 189, 192 (4th Cir. 1992) ("[i]f there is more than one permissible inference as to intent to be drawn from the language employed, the question of the parties' actual intent is a triable issue of fact"). Because the parties disagree about the intent and construction of the MPDP Agreement, Caremark's motion for summary judgment must fail.

### 4. Medco's Processing Of DOD Claims On Behalf Of Plaintiffs Is Not Relevant To This Action.

Equally meritless is Caremark's contention that Coventry's relationship with its current pharmacy benefits manager ("PBM"), Medco, is somehow relevant to Plaintiffs' claims against Caremark for breach of contract in this action. Caremark alleges that Coventry's communications with Medco show that Coventry: (1) understands that its PBM would need additional information to apply the HMO exception; and (2) acquiesces to the treatment of non-contracted DOD Pharmacy as "in-network." See Caremark's Brief at p. 14. Putting aside whether these issues are even relevant to this case, they miss the mark entirely.[10]

First of all, Medco pays DOD Claims on behalf of Coventry's Health Plans because, unlike Coventry or Caremark, Medco has agreements with DOD Pharmacies. See Giardina Aff.

---

Caremark's Response to Plaintiffs' Motion for Remand at p. 3, Docket Entry #23. If Caremark now contends that the Court need not interpret federal law to dispose of this action, the federal subject matter jurisdiction would be lacking. See Caremark's Brief at p. 10 ("This is a breach of contract case.").

[10] Because evidence of performance of the contract between Coventry and Medco is not relevant to this dispute and would serve no other purpose than to waste time and resources at trial, Plaintiffs intend to file a motion in limine to preclude such evidence.

at ¶ 21.  If anything, Medco's treatment of DOD Claims as "in-network" only supports Plaintiffs'
position in this litigation -- Coventry's policy is to pay claims from DOD Pharmacies that are
Participating Pharmacies and deny claims from DOD Pharmacies that are Non-Participating
Pharmacies unless one of the exception criteria applies.

Second, nothing from Coventry's relationship with Medco shows that Caremark needed
additional information to apply the HMO Exception.  Caremark knew, or had access to, all of the
necessary information.[11]  Specifically, Caremark knew the following:

- In the MPDP Agreement, Coventry instructed Caremark to pay claims from
  Participating Pharmacies.  See MPDP Agreement.

- Coventry provided Caremark with a list of its "Participating Pharmacies".  See
  Giardina Aff. at ¶ 7.

- Caremark obviously knew which pharmacies were "Participating Pharmacies" and in
  its own network.

- DOD Pharmacies were not "Participating Pharmacies" in the Coventry network or the
  Caremark network.  Id. at ¶¶ 6, 8.

- Coventry provided Caremark with "exception criteria" for paper claims.  See
  Giardina Aff. at ¶ 13; Exhibit 1.

- Coventry told (or at the very least Caremark had access to information that revealed
  to) Caremark which plans were HMOs.[12]  See Giardina Dep. at 71:8-72:13; 85:9-21;
  Breslin Dep. at 58:9-59:1; 60:3-15; Ford Dep. at 30:12-25 and 31:5-15.

Interestingly, during the time period when the parties were trying to resolve this dispute
and before Plaintiffs filed their Complaint, Caremark never even suggested to Coventry that it
needed additional information to decide whether the HMO Exception applied to certain claims.

---

[11] Caremark relies upon the statement that Coventry "would have to tell Medco what plans
qualify for the exception [HMO Exception]" to support its argument that Caremark did not have
the necessary information to apply the HMO Exception.  See Caremark's Brief at p. 14, fn. 4.
Caremark's argument overlooks that fact that it already had all of the information that it needed
to apply the HMO Exception.

[12] In paragraph 5 of its statement of uncontested facts, Caremark admits that it knew that the
Health Plans offered HMO plans.  See Caremark's Facts at ¶ 5.  As stated previously, Ms.
Breslin testified that "it would not make a difference" whether any particular plan was an HMO.
See Breslin Dep. at 57:2-11; 60:16-23.

This course of performance on the part of Caremark is, of course, telling. Caremark raised the issue for the first time when it filed its motion for summary judgment. Charitably viewed, this argument is nothing more than an after-the-fact attempt by Caremark to create a defense to Plaintiffs' claims in this litigation.

**C.**    **Plaintiffs Have Not Waived Any Breach of Contract Claim Against Caremark**.

Caremark's contention that Plaintiffs "waived any argument they may have had pursuant to the HMO exception by their knowledge of and failure to object to Caremark's processing of DOD pharmacy claims as 'in-network'" fares no better. <u>See</u> Caremark's Brief at p. 15. Caremark's argument fails under the express terms of the MPDP Agreement, as well as the law.

First, Section 19.7 of the MPDP Agreement states:

> The failure of either party to insist, in any one or more instances, upon performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or a relinquishment of any right or claim granted or arising hereunder or of the future performance of any such term, covenant, or condition, and such failure shall in no way affect the validity of this Agreement or the rights and obligations of the parties hereunder.

<u>See</u> MPDP Agreement at § 19.7. Based on this language in the parties' agreement, even if Caremark's rendition of the facts was correct (which Coventry denies), Coventry could not have waived its right to object to Caremark's processing of DOD Claims.

Second, under Maryland law, waiver is an intentional and voluntary relinquishment of a known right. <u>See</u> <u>From the Heart Church Ministries, Inc. v. Philadelphia-Baltimore Annual Conference</u>, 964 A.2d 215, 238 (Md. Ct. Sp. App. 2009)(citing <u>Gold Coast Mall, Inc. v. Larmar Corp.</u>, 468 A.2d 91, 98 (Md. 1983)). "The intention to waive must be clearly established and will not be inferred from equivocal acts or language." <u>Id.</u> Waiver rests upon the *intention* of the party and therefore the acts relied upon as constituting waiver "must unequivocally demonstrate that waiver is intended." <u>Taylor v. Mandel</u>, 935 A.2d 671, 686-87 (Md. 2007)(citing <u>Gould v.</u>

<u>Transamerican Assocs.</u>, 167 A.2d 905, 909 (Md. 1961)). Here, Caremark cannot point to a single act by Plaintiffs that "unequivocally demonstrated" that they *intended* to waive any dispute to Caremark's processing of DOD Claims.

There is no dispute that Caremark has failed to produce a writing signed by both parties for the purpose of amending the parties' contract to allow payment of all DOD Claims, as required by Section 19.1 of the MPDP Agreement. <u>See</u> MPDP Agreement at § 19.1. Caremark seeks to avoid this problem by contending that Plaintiffs' knew that it was paying DOD Claims and did not object to Caremark's treatment of these claims. <u>See</u> Caremark's Brief at p. 9. In support of this argument, Caremark offers only the following: (1) a matrix prepared for the Nebraska Medical Center under the Mutual of Omaha Plan; (2) a handful of plan design documents prepared for a health plan that is not a party to this lawsuit; and (3) a disputed conversation between individuals at Coventry and Caremark that is not corroborated in writing. None of these items withstand scrutiny, much less rise to the level of proving Coventry's unequivocal waiver of a known contract right under the law.

        **a.**      <u>**The Mutual Of Omaha Matrix And Plan Design Documents**</u>.

First, the matrix prepared for the Nebraska Medical Center under the Mutual of Omaha Plan had limited application, as it addressed only the processing of claims for the Mutual of Omaha Plan. <u>See</u> Mutual of Omaha Matrix, which is attached to Caremark's Statement of Undisputed Facts as Exhibit "9". The matrix stated (in extremely small print) that, "[a]ll claims dispensed through federal facilities for Federal Health Insurance programs (such as Veteran Administration, Department of Defense, and Indian Health Services) and State Medicaid programs are treated as in-network claims." Shawn Burke, Coventry's Regional Vice President for Pharmacy Services acknowledged Caremark's methods of processing Mutual of Omaha DOD pharmacy claims as "in-network." <u>See</u> Burke Dep. at 111:3-113:6. Importantly, Ms.

521603.1_08639.001

Burke stated that Caremark processed DOD claims as in-network for Mutual of Omaha because when Coventry purchased Mutual of Omaha, it inherited the pre-existing relationship between Caremark and Mutual of Omaha pursuant to which Caremark was already paying DOD Claims only for Mutual of Omaha.  Id.  As Ms. Burke explained, when Coventry acquired Mutual of Omaha, it _had_ to set-up the benefits for these plans exactly as they were set-up by Mutual of Omaha.  Id.  Coventry was not permitted to "change" these benefits until an employer group agreed to make such a change to their benefit plan.  Id.  Ms. Burke testified that the language contained on the Mutual of Omaha matrix, which stated that Caremark treated DOD claims as in-network, was "specific" to the Nebraska Medical Center under the Mutual of Omaha Plan.  Id. Ms. Burke also noted that this method was "not the Coventry standard."  Id. at 111:5-17.

Consistent with Ms. Burke's testimony, Jim Giardina, Coventry's Regional Vice President for Pharmacy Services, testified that the information in the matrix applied only to a benefit for a single employer group (The Nebraska Medical Center) under a single Plan (Mutual of Omaha), was "effective" on April 1, 2008, and did not apply to "all government pharmacy claims."  See Giardina Dep. at 106:3-107:13; Giardina Aff. at ¶ 16.  Specifically, when counsel for Caremark showed Mr. Giardina the document relied upon by Caremark ("The Mutual of Omaha Matrix"), Mr. Giardina responded as follows:

> Q.     So isn't it a fact that Coventry was aware no later than December 2007 that Caremark was processing government claims as in-network claims?
> A.     Not to my knowledge.  I -- I see this statement as a direction related to a particular benefit.  I don't see this statement as a prior acknowledgement of prior activity and other health plans for other benefits. This -- this document refers to an employer group, the Nebraska Medical Center. That's all I see in this.  I don't -- I don't infer anything else from this document –
> Q.     So –
> A.     -- other than instructions on a go-forward basis how to process claims for this employer.  The effective date on Page 1 is 4/1 of 2008.  It was submitted on or about 12/12 of 2007.  I don't see it as a retrospective document.  I see it as a future document related to the Nebraska Medical Center.

521603.1_08639.009

Q.   So from -- from the end of 2007 forward, Coventry was instructing Caremark to process all claims dispensed through federal facilities as in-network claims?

A.   I don't see that in this document.  I see -- I -- again, I see this document to refer specifically to a benefit for an employer group.  That -- that's exactly what I see in here.  I'm sorry.  I see nothing more than that.

Id.

Notably, the matrix and the language relied upon by Caremark does _not_ say that the treatment of DOD Claims as "in-network" was or is a uniform or standard Caremark policy that applied to all plans.  Again, this language did not convey any information to Coventry about how Caremark processed all DOD Claims.  Moreover, in no way did Coventry agree to Caremark's payment of all DOD Claims for all Health Plans based on the Mutual of Omaha Matrix.  See Giardina Aff. at ¶ 16.  Nor was this Matrix presented as representing such an agreement by Caremark.  Id.  As such, the Mutual of Omaha matrix fails to demonstrate Coventry's unqualified agreement for Caremark to treat all DOD Claims as in-network.

For similar reasons, Caremark's reliance on the handful of documents is equally misguided.  These documents were prepared in 2006 for First Health Group Corp. ("First Health")  See  Affidavit of Lori Schaefer ("Schaefer Aff."), which is attached to Plaintiffs' Notice of Filing as Exhibit "O", at ¶ 5.  These documents applied to First Health _only_, were not meant to be a statement of Coventry's standard policy or procedures and did not apply to any other Health Plans.  Id.  First Health Group Corp. is no longer a Plaintiff in this litigation.  See Stipulation of Dismissal at Docket Entry No. 55.

When viewed in context, neither the Mutual of Omaha Matrix prepared in 2007 nor the Plan Design Documents prepared for First Health in 2006 conveyed any information about how Caremark processed government pharmacy claims _under any other Plan or from the beginning of the MPDP Agreement in 2000_.  Indeed, as Caremark's witnesses have conceded, the language on the Mutual of Omaha Matrix and the First Health Plan Design Documents stating that DOD

claims are "treated as in-network claims" did not appear on the benefit matrix ("Altius Matrix") that Caremark used to set-up the Altius Health Plans (the Plans that account for the majority of the claims in this case) or the matrix ("HAPA Matrix") that it used to set-up another large plan, Health-America Pennsylvania, Inc. See Breslin Dep. at 146:16-147:6. In fact, Caremark has not produced any evidence in this case to show that it provided to Coventry any documents containing any language purportedly authorizing the payment of any DOD Claims before December 1, 2006. Ms. Breslin testified that she has never seen a plan design document dated earlier than 2006. See Breslin Dep. at 87:15-20.

In sum, no matter how broadly Caremark tries to interpret the language on the Mutual of Omaha Matrix and the First Health plan design documents, those documents could not have informed Coventry about how Caremark processed all DOD claims. This conclusion is only further compelled by the absence of such language on the Altius Matrix and the HAPA Matrix and other plan documents and by the testimony of the witnesses in this case. The Matrix and Plan Design Documents that Caremark relies on in support of its waiver argument apply only to specific employers groups, under specific Health Plans, many years into the parties' relationship. Significantly, Caremark has not set forth any evidence that Plaintiffs *approved or agreed* with the language regarding DOD Claims in those documents. Ms. Breslin herself testified that the Plan Design Documents had to be agreed to by Coventry, but she had not seen any "sign-off" by Coventry, nor has Caremark produced any such sign-off. See Breslin Dep. at 87:15-88:12. Similarly, assuming that a 2007 or 2008 conversation about DOD Claims occurred as Mr. Blandford contended (which Coventry disputes), Caremark has not alleged that Coventry approved or agreed with Mr. Blandford's alleged disclosure to Coventry employees that Caremark paid DOD Claims. As such, Caremark cannot establish that Plaintiffs intended to waive their rights to dispute Caremark's improper payment of DOD Claims.

### b.  The "Alleged" Conversation Between Caremark And Coventry "In Or About 2007 Or 2008."

Caremark alleges that, "in or about 2007 or 2008," Larry Blandford, one of Caremark's former managers for Coventry's account, and certain other Caremark employees told Michael Rothrock and "<u>possibly</u>" Maria Scalise of Coventry that Caremark paid DOD Claims.  <u>See</u> Caremark's Facts at ¶ 49.  Mr. Rothrock denies having this conversation with anyone at Caremark.  <u>See</u> Affidavit of Michael Rothrock ("Rothrock Aff."), which is attached to Plaintiffs' Notice of Filing as Exhibit "N", at ¶ 4.  The conversation is not corroborated by any written documents.  In fact, during the transition from the Coventry network of pharmacies to the Caremark network of pharmacies no one at Caremark stated how it would process claims specifically from DOD pharmacies.  <u>Id.</u>  Caremark personnel never stated that it would treat DOD claims differently from other paper claims processed by Caremark.  As such, these purported conversations (based on Caremark's allegations, not even it is certain that Ms. Scalise participated in such a conversation) are highly disputed and cannot serve as a proper basis for summary judgment in Caremark's favor.

### D.  Altius Lawfully Withheld Payment From Caremark.

Caremark also asks the Court to grant summary judgment in its favor on Caremark's counterclaim against Plaintiffs.  The Court should deny Caremark's request because Altius lawfully withheld payment from Caremark under the terms of the MPDP Agreement.

Altius – the only Plaintiff in this action that withheld any payments to Caremark – began to withhold payments to Caremark for DOD Claims that Altius believes should not have been paid by Caremark.  <u>See</u> Caremark's Facts at ¶ 54.  Altius withheld these payments under Sections 14.2(a)(i) and (ii) of the MPDP Agreement.  <u>See</u> MPDP Agreement at § 14.2(a)(i) and (ii).  Section 14.2(a)(i) states, in part that "COVENTRY or PLAN shall be financially responsible for the payment of Prescription Drug Benefit claims when processed in accordance

with this Agreement [the MPDP Agreement].  Id. at § 14.2(a)(i).  Section 14.2(a)(ii) provides, in part that "[i]f COVENTRY or a PLAN disputes any item on the statement of account, COVENTRY or the PLAN shall state the amount in dispute in writing within thirty (30) days of the date of the statement of account."  Id. at § 14.2(a)(ii).  To date, Altius has withheld $223,898.63 from Caremark in connection with Caremark's improper processing of DOD Claims.  See Clay Aff. at ¶ 9.  Altius acted lawfully under the terms of the MPDP Agreement.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny Caremark's motion for summary judgment.

Respectfully submitted,

/s/ Michael L. Eidel
Michael L. Eidel
Amy C. Purcell
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2000
meidel@foxrothschild.com
apurcell@foxrothschild.com
Pro Hac Vice

J. Scott Hickman (No. 017407)
Sherrard & Roe, PLC
424 Church Street, Suite 2000
Nashville, Tennessee 37219
(615) 742-4200
shickman@sherrardroe.com

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of January, 2011, I filed the foregoing with the CM/ECF system thus causing a copy to be served upon:

Jennifer L. Weaver, Esq.
Sheila Sawyer, Esq.
Michael A. Gardner, Esq.
Waller, Lansden, Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219

Attorneys for Defendant

/s/ Scott Hickman
J. Scott Hickman