# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| COVENTRY HEALTH CARE, INC., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 3:09-cv-1009 |
| ) | |
| CAREMARK, INC., ) | Judge Thomas A. Wiseman, Jr. |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Now before the Court is a Motion for Summary Judgment (Doc. No. 79) filed by defendant Caremark, Inc., asserting that it is entitled to judgment as a matter of law in its favor, both as to Coventry's claims in its Complaint and as to Caremark's own counterclaims. Plaintiffs are Coventry Health Care, Inc. ("CHC") and twenty-two of its subsidiaries, all health insurance plans of various types (the "Coventry Health Plans"). (Plaintiffs are referenced herein collectively, in the singular, as "Coventry," unless it is necessary to distinguish among them.) In its response to Caremark's motion, Coventry concedes that its claim for a declaratory judgment has been mooted by the termination of the parties' contractual relationship, but otherwise denies that Caremark is entitled to summary judgment.

Given Coventry's concession, the Court will grant summary judgment to Caremark with respect to the declaratory injunction claim. As for the other claims pending in this matter, the Court finds that federal law generally requires the treatment of reimbursement claims submitted by Department of Defense ("DoD") pharmacies as if they are in-network, even if the DoD pharmacies are out-of-network. The Court also finds, however, that a limited regulatory exception permits the denial of out-of-network DoD pharmacy claims submitted on behalf of individuals covered by an HMO health plan, as opposed to another type of health plan, if certain requirements are met. Consequently, Caremark's assertion that it was required by law to process and pay all DoD pharmacy claims is not entirely accurate. Further, the facts viewed in the light most favorable to Coventry, for purposes of summary judgment, lead the Court to conclude that Caremark has not established either that it did not breach the parties' contract or that Coventry waived Caremark's compliance with the agreement in regards to the treatment of DoD

pharmacy claims. Caremark is therefore not entitled to summary judgment in its favor.

I.      **FACTUAL AND PROCEDURAL HISTORY**[1]

Defendant Caremark provides pharmacy benefit management services to sponsors of health benefit plans, such as insurance companies, private employers, unions and government employee plans. Caremark's services include filling prescriptions through Caremark's mail-order pharmacies, providing access to a national network of retail pharmacies, and processing reimbursement requests from plan members and government agencies. Caremark provides these services pursuant to written contracts with its clients. CHC, through its subsidiaries, offers different types of health insurance plans throughout the country, including preferred provider organization ("PPO") plans, point-of-sale ("POS") plans, and health maintenance organization ("HMO") plans.

In or around July 1999, CHC and its subsidiaries entered into a Managed Prescription Drug Program Agreement ("MPDP Agreement") with Caremark, as amended on July 1, 2006. Pursuant to the MPDP Agreement, Caremark agreed to process and pay pharmacy claims submitted by or on behalf of the members of Coventry's various health plans. Among the many pharmacy claims administered and processed by Caremark pursuant to the MPDP Agreement, as amended, are claims from federally operated Department of Defense ("DoD") pharmacies located on military bases. The DoD operates pharmacies in military treatment facilities located on military bases serving active-duty personnel, some of whom also have healthcare coverage through private insurers such as Coventry. Individuals having government insurance coverage and private insurance are referred to as "dual eligibles" because they have two separate sources of coverage for their medical needs—the federal government and private insurance companies. (Breslin Decl. ¶ 9.)

During the timeframe relevant to this dispute, Caremark processed millions of pharmacy claims on Coventry's behalf, of which a small proportion consisted of federal government reimbursement requests from the DoD, the Veterans Administration ("VA"), and Indian Health Services ("IHS"). The DoD,

---

[1] The Court notes that Coventry's response to Caremark's statement of undisputed facts was not in compliance with local rule. Specifically, Coventry's response to each of Caremark's statements should have been directed specifically to Caremark's actual statement of fact, either admitting or denying the statement, with reference to the record in the latter event. To the extent Coventry contends other disputed facts in the record are relevant, it should have filed its own statement of facts, to which Caremark would then have had an opportunity to respond.

VA and IHS operate pharmacies to provide prescription drugs to their beneficiaries. In the Complaint, Coventry alleges that Caremark had an obligation under the MPDP Agreement "to pay only those DOD Pharmacy Claims that are covered by the member's applicable Coventry Health Plan, except as otherwise required by an overriding law or regulation." (Compl. ¶ 39.) Coventry discovered in or around March 2009 that Caremark was paying "DOD Pharmacy Claims that Caremark should not have been paying" (Compl. ¶ 41), specifically, DoD Pharmacy Claims for dual-eligible individuals whose Coventry health plans do not provide a pharmacy benefit for out-of-network pharmacy claims. (Compl. ¶ 42.) DoD pharmacy claims are out-of-network claims because neither Caremark nor Coventry had provider agreements with DoD pharmacies. Coventry further alleges in the Complaint that "[t]here is no overriding law or regulation which requires that out-of-network DOD Pharmacy Claims be paid by Caremark and, ultimately, by Coventry." (Compl. ¶ 43.)

Although the allegations in the Complaint appear to cover *all* DoD pharmacy claims processed and paid by Caremark for Coventry, it is apparent from Coventry's response in opposition to summary judgment that Coventry has, in the course of discovery and further research, substantially narrowed its claims. Specifically, Coventry now apparently seeks reimbursement for only a subset of the DoD pharmacy claims paid by Caremark—to wit, those DoD pharmacy claims submitted on behalf of individuals covered by a Coventry HMO plan (as opposed to a PPO, POS, or any other type of plan).

The law regarding the treatment of these particular claims is discussed in greater detail below. May it suffice to say at this point that, while insurers generally must treat (and reimburse) pharmacy claims from the DoD, the VA and the HIS as if they were "in-network," the law also provides an exception to that general rule, pursuant to which DoD claims submitted by individuals who are members of an HMO plan may be denied if the HMO does not provide coverage for medications procured from non-participating pharmacies, including DoD pharmacies (the "HMO exception").[2] After Coventry gave notice to Caremark that it should not be paying DoD pharmacy claims as in-network, Coventry began withholding payment from Caremark for those claims. Coventry contends it is entitled to recover from Caremark the amounts it paid for claims that Caremark erroneously covered before Coventry discovered

---

[2] Coventry references the regulation in which the HMO exception appears, 32 C.F.R. § 220.4, in the Complaint (Compl. ¶ 44), but the claims for damages in the Complaint are not apparently limited to pharmacy claims to which the exception applies.

the problem. Caremark maintains that it appropriately paid the claims and that Coventry remains liable to it for reimbursement of the claims it already processed up until the termination of the parties' contractual relationship later in 2009.

Caremark originally maintained in this suit that it was obligated under the law to cover all DoD pharmacy claims as in-network. Now it appears also to contend that (1) Coventry was aware that Caremark was paying the claims and effectively waived its ability to object to such payments, and (2) Coventry failed to instruct Caremark adequately regarding the treatment of the DoD pharmacy claims by HMO members, as a result of which failure Coventry is responsible for the payments. Coventry, as indicated above, originally took the position that Caremark should not have processed or paid *any* DoD pharmacy claims. Now it apparently concedes that Caremark was obligated under the law to pay some of the claims, but was explicitly exempt from paying those claims submitted by individuals who are HMO members. Coventry has now restricted its damages estimates to those types of claims.

The more particular facts relating to the parties' positions are as follows. Caremark insists that it informed Coventry that it would treat the DoD claims it processed on Coventry's behalf as in-network, citing the deposition testimony of Larry Blandford, Pharm. D., Caremark's former manager of the Coventry account from 2005 through 2008. According to Dr. Blandford, Caremark and Coventry reached an agreement in the summer of 2007 or 2008 that Coventry would utilize Caremark's network of participating pharmacies rather than contracting its own pharmacy network. (Blandford Dep. 48:23–49:18.) Dr. Blandford further testified that, in connection with the "transition from Coventry-owned networks to utilizing Caremark's national network solely" (*id.* 73:17–19), the parties had some discussions about how the reimbursement of claims from DoD pharmacies would be treated. Dr. Blandford, however, did not "recall the . . . specifics" of such discussions or among whom they took place; he only recalled that the issue was discussed and thought it might have been among Michael Rothrock and "possibly Maria Scalise" on Coventry's side, and "individuals from [Caremark's] pharmacy network administration department," among others. (Blandford Dep. 73:23–74:9.) The point of the discussions would have been to convey an understanding of how Caremark handled DoD claims. According to Blandford, he did not know whether DoD pharmacy claims were classified as in-network, but as a matter of Caremark's "standard pharmacy network administration," such claims were processed and paid by Caremark, as

opposed to being rejected, and he believed Caremark informed Coventry of that fact. (Blandford Dep. 75:6–76:15.)

Coventry, however, denies that these purported discussions ever took place, and points to testimony from Rothrock and Scalise denying participation in any such conversations. (Rothrock Aff. ¶ 4 ("[N]o conversation occurred . . . with Caremark personnel wherein Caremark stated how it would process DOD pharmacy claims."); Scalise Aff. ¶¶ 3–5 (stating she was involved in the transition from the Coventry network of pharmacies to the Caremark network which took place in October 2008, and was involved in multiple telephone calls with Larry Blandford, among others, and was never party to or made aware of any conversations involving Caremark's treatment specifically of DoD claims).)

Caremark also contends that

the plan design documents during the relevant time period in this case contained the following disclosure language regarding the treatment of government pharmacy claims (including DoD claims):

All claims dispensed through federal facilities for Federal Health Insurance Programs (such as . . . Department of Defense . . . ) and State Medicaid programs are treated as in-network claims.

(Def.'s Statement of Undisp. Facts ¶ 24 (quoting Def.'s Ex. 6, Doc. No. 87, at 9).) The referenced document cited in support of this contention appears as an attachment to a string of emails exchanged at the end of November and beginning of December 2006 among representatives from both parties, and is described therein as "documentation to be utilized in completing the plan benefits for FH phase 1 implementation," to be reviewed during a planned conference call. (Doc. No. 87, at 2, 3.) The term "FH" apparently refers to a specific Coventry Health Plan, First Health Group Corp. ("First Health"), which is no longer a plaintiff in this action, and there is no clear indication that the referenced statement applied across the board to Caremark's treatment of DoD pharmacy claims. According to Coventry, Coventry acquired First Health in or around 2005. Coventry began the process of converting claims-processing services on behalf of First Health to Caremark in late 2006, and the Plan Design Document template upon which Caremark relies applied to First Health only, was not consistent with Coventry's standard policy or procedures, and did not apply to any other Coventry Health Plan. (Schaefer Aff. ¶¶ 3–5.) As such, the document is not generally applicable to all Coventry plans; more specifically, there is no evidence that the referenced language appears on the benefit matrix Caremark used to set up, for

example, the Altius Health Plans, which apparently account for the majority of claims in this case, or the matrix used to set up another large plan, Health-America Pennsylvania, Inc.

In any event, it is clear that Caremark processed and paid DoD pharmacy reimbursement claims as if they were "in-network" claims, regardless of whether the operative Coventry Health Plan implicated by the claim was an HMO for nearly the entirety of the parties' ten-year business relationship. Not until March 2009 did Coventry first object to Caremark's treatment of DoD pharmacy claims as in-network, after it had already notified Caremark that it would be terminating the contract and ending the parties' relationship effective December 2009. (Breslin Decl. ¶ 11.)

According to Coventry, it was not aware of and therefore did not object to Caremark's treatment of DoD claims until shortly after Altius Health Plan noticed a "spike" in the number of paper pharmacy claims paid by Caremark on behalf of Altius (Clay Dep. 51:9–56:20), which coincidentally occurred shortly after Coventry had given notice to Caremark that it would be terminating the parties' ten-year relationship with the expiration of the MPDP Agreement by its own terms. Caremark's initial response (two months later) was to state that it would revise its system to reject claims from DoD pharmacies. (Palmer Aff. ¶ 6 & Ex. 1.) Five weeks later, Caremark changed course and indicated that the DoD claims had not been paid incorrectly but rather had been paid because Caremark was prohibited by law from rejecting the claims as out of network. (*Id.* ¶ 8 & Ex. 2.)

Pursuant to the MPDP Agreement as amended, each party was required to "comply with the provisions of all applicable law relating to the performance of its obligations" under the agreement, but neither party had the responsibility "to advise the other about such party's compliance with any Law." (Doc. No. 85, Amendment ¶ 4(f) (amending MPDP Agreement § 2.4).) In addition, the MPDP Amendment included a paragraph headed "Government Agency Submitted Claims," which states as follows:

> COVENTRY acknowledges that government agencies . . . may seek eligibility or similar data from Caremark regarding Covered Individuals[3] and may submit to Caremark claims for, on behalf of and/or in the name of Covered Individuals. COVENTRY authorizes

---

[3] The term "Covered Individual" is defined in the MPDP Agreement as "an individual who is covered under a Prescription Drug Benefit Plan or a plan of health care coverage . . . underwritten, issued or administered by a [Coventry Health] PLAN . . . as such information is provided to CAREMARK by PLAN in accordance with the terms of this Agreement." (Doc. No.82, MPDP Agreement § 1.)

> Caremark to provide such data as requested by government agencies or their authorized agents, and *further authorizes Caremark to process such Claims in accordance with COVENTRY's written direction, which shall be in accordance with applicable laws and regulations.* Caremark shall provide to COVENTRY a list of government agencies from whom Caremark may receive such claims, which may be updated from time to time by Caremark.

(Doc. No. 85, at 8, Amendment ¶ 14 (amending MPDP Agreement § 4.1(g)) (emphasis added).) The original MPDP Agreement as originally executed does not include a provision specifically addressing the processing of government claims. It does, however, include § 2.4(a), which required Caremark's compliance with all federal laws and regulations, and further documented Caremark's agreement to "comply with any and all applicable COVENTRY and COVENTRY HEALTH PLANS' programs, policies and procedures, as may be enacted, and revised from time to time, including, but not limited to, . . . participating provider requirements, . . . billing and claims submission policies, . . . .COVENTRY and COVENTRY HEALTH PLANS' Formulary and prescription drugs and network pharmacy use requirements . . . ." (Doc. No. 82, MPDP Agreement § 2.4(b).) It also defines the term "Participating Pharmacy" as "a pharmacy which has entered into an agreement with CAREMARK, COVENTRY, or a PLAN to provide prescription drug services to individuals designated by CAREMARK, COVENTRY, or a PLAN, as applicable." (*Id.* § 1.) The term "Non-Participating Pharmacy" is defined as "any pharmacy that does not have an agreement with CAREMARK, COVENTRY, or a PLAN to provide services to covered individuals." (*Id.*)

It is undisputed that the terms of the parties' agreement unambiguously required that Caremark perform claims-processing services for "Participating Pharmacies." DoD Pharmacies, by definition, are not Participating Pharmacies. In addition, under the agreement, Coventry is required to pay fees to Caremark only for claims processed from Participating Pharmacies, and is financially responsible for the payment of prescription drug benefit claims only when processed in accordance with the terms of the agreement. Finally, the MPDP Agreement, as amended, provides that Coventry has "final discretionary authority with regard to the payment of any disputed claim, according to the process and policies established and/or followed by [Coventry]." (MPDP Agreement § 4.1(a); Amendment ¶ 14 (amending MPDP Agreement with a new § 4.1(i)).)

In its complaint, Coventry alleged that "[i]t is Caremark's contractual responsibility to pay only

those DOD Pharmacy Claims that are covered by the member's applicable Coventry Health Plan, except as otherwise required by an overriding law or regulation." (Compl. ¶ 39.) Although Caremark initially admitted that allegation (Answer ¶ 39), it is apparently retreating from that position now. Rather than focusing on whether it was illegal to deny the subject claims, Caremark insists that Coventry never instructed Caremark to process DoD pharmacy claims on any basis other than that they were out of network. (Caremark's Statement of Undisp. Facts ¶ 31 (citing Giardina Dep. 62:9–63:3 (in response to questioning, agreeing that it was "appropriate to deny any government claim as out-of-network if there's no contract between the plan and the DOD facility," so long as the specific plan only provided coverage for "participating pharmacies"); *id.* 82:5–9 ("Q. If a Coventry plan did not have a contract with a DOD pharmacy, then it's your position those claims should be denied as out-of-network; is that correct? A. Yes.").)

In other words, Coventry never gave Caremark any written instructions for dealing specifically with claims submitted by government agencies. It did, however, provide written "direction regarding in-network and out-of-network claims" (Giardina Dep. 84:5–9), and for how to process claims submitted by HMO members as opposed to claims submitted by PPO members. (Giardina Dep. 85:22–86:4.) Specifically, Giardina testified that Caremark was instructed to deny out-of-network claims unless such a claim is "either submitted within the first thirty days of a member's eligibility or is related to urgent/emergent services." (Giardina Dep. 86:7–17.) That instruction to Caremark was issued in August 1999, about one month after the parties entered into the MPDP Agreement, as a result of Caremark's contacting Coventry to ask for additional instructions on the processing of paper claims. Coventry responded by instructing Caremark, in writing, that the "exception criteria" for payment of paper claims[4] were: (1) the claim was submitted within thirty days of the member's enrollment; or (2) the claim was for medications associated with an emergency; and (3) the claim must be filed within six months of date of service. (Giardina Aff. ¶ 13 and Ex. 1.) Coventry contends this instruction applied to all paper claims

---

[4] Generally speaking, out-of-network claims are "paper claims," because in-network claims are submitted electronically rather than on paper. (*See* Burke Dep. 36:7–9 ("If it's not a network pharmacy, there is no pricing attached so it had to be a paper claim by default. It could not be submitted or adjudicated online.").) DoD Pharmacy claims were always "paper claims" because DoD pharmacies were not in-network.

submitted by members whose plans did not provide an "out-of-network" benefit. (Burke Dep. 44:21–45:10.) Coventry concedes that some of the Coventry prescription benefit plans provide out-of-network pharmacy benefits to their members, but claims paid under those Plans with out-of-network benefits are not included in Coventry's updated calculation of damages in this case. If a member's benefit plan had an out-of-network benefit, then Caremark would pay a paper claim submitted by such member according to the terms of the member's plan. Coventry maintains that it identified for Caremark those plans that had out-of-network benefits by including such information in plan-design documents and benefit matrices. (Burke Dep. 36:19–23.)

Caremark contends it "unequivocally" informed Coventry that it processed all government pharmacy claims—including DoD pharmacy claims—as "in network" claims. (Def.'s Statement Undisp. Facts. ¶ 34 (citing Def.'s Ex. 9).) The referenced exhibit (Doc. No. 88) is titled "Caremark/Mutual of Omaha Plan Design Matrix, and dated 12/11/2007 (though the space for a date after "Client Approval" is blank). On its face applies only to the Nebraska Medical Center and is dated 12/11/2007. In a shaded area that is virtually illegible on the version of this document submitted to the Court, appears the following statement: "All claims dispensed through federal facilities for Federal Health Insurance programs (such as Veteran Administration, Department of Defense, and Indian Health Services) and State Medicaid programs are treated as in-network claims." (Doc. No. 88, at 19.) Coventry, however, points to Jim Giardina's deposition testimony and later averment in his affidavit, in which he confirmed that the information in this document pertained only to a benefit for a single employer group (The Nebraska Medical Center) under a single plan that is not a plaintiff in this action (Mutual of Omaha), effective April 1, 2008, and as such, it did not apply across the board to all government pharmacy claims. (Giardina Dep. 105:13–107:20; Giardina Aff. ¶ 16.)

Caremark asserts that the regulation pertaining to the so-called "HMO exception" states that HMOs may not exclude claims or refuse to certify emergent and urgent services provided within the "HMO's service area, or otherwise covered non-emergency services provided out of the HMO's service area."[5] 32 C.F.R. § 220.4(c)(3). Coventry readily admits that it never provided Caremark with any

---

[5] Mr. Giardina defined the HMO service area as the area in which the HMO plan has an established network; it is generally has both geographical and contractual components. (Giardina Dep.

information regarding the service areas for its HMO health plans. Coventry contends however that in deciding whether to deny or pay a DoD pharmacy claims, Caremark did not need to know the service area of the HMO—it only needed to know whether the pharmacy was contracted (in-network) or not (out-of-network).[6] (Giardina Dep. 160:6–22; Giardina Aff. ¶ 14.) Further, according to Coventry, it did inform Caremark which health plans were HMOs (Giardina Dep. 71:8-72:13; 85:9-21; Giardina Aff. at ¶ 15).[7]

Coventry objected to Caremark's treatment of DoD claims as in-network in March 2009 and filed this lawsuit in September 2009, asserting that all DoD pharmacy claims should have been denied in the ordinary course because they were out-of-network claims that were not "covered benefits" and therefore "should not [have been] paid on Coventry's behalf by Caremark, and in turn should not [have been] invoiced to Coventry by Caremark." (Complaint ¶ 45; see also Pls.' Answer to Def.'s Interrog. No. 7 ("DOD Pharmacy Claims . . . were paper claims from an out-of-network pharmacy and, accordingly, subject to regular rules for processing paper claims submitted more than thirty days after a member's enrollment."); Giardina Dep. 91:5–25 (confirming Coventry's position that its paper-claims benefit required denial of all DoD, VA and HIS claims submitted after the first thirty days of a member's eligibility effective date).

Caremark has now filed its motion for summary judgment. It asserts that it is not liable in any amount to Coventry, and that Coventry still owes it $438,805.80 as of December 16, 2010 for

---

158:6–159:19.) "[U]nder an HMO contract . . . , a member needs to use facilities, obtain services that are contracted. Generally, those contracts are . . . within a particular service area." (Giardina Dep. 159:18–22.)

[6] As a matter of common sense, the veracity of that statement is questionable. If a member of a Utah HMO became ill and was required to fill a prescription while visiting relatives in Massachusetts, it is reasonable to assume that the claim would come from outside the member's HMO service area and would, apparently, be payable. This disputed fact would go more to the quantification of damages, however, than to the question of liability.

[7] Coventry contends that "Caremark's witnesses admitted that 'it would not make a difference' for payment purposes whether any particular plan was an HMO." (Doc. No. 100, Pls.' Resp. to Def.'s Statement of Undisp. Facts ¶ 36 (quoting Breslin Dep. at 57:2-11, 60:16-23).) Breslin's testimony is taken out of context however: She simply indicated that it would not "make a difference" whether a plan was an HMO plan for purposes of the implementation and installation process. (Breslin Dep. 57:4–58:17; see id. 60:16–22 ("Q. Are you saying that as far as Caremark is concerned whether or not the particular Coventry plan that was being implemented was an HMO or not did not matter to the implementation process; is that correct? A. That's correct.").) Breslin expressly disclaimed any knowledge of whether the distinction was important for purposes of payment of a claim. (Breslin Dep. 60:25–61:8.)

reimbursement amounts that Coventry has withheld. Breslin Decl. at ¶ 15. Coventry maintains that, to date, Altius Health Plans has withheld only $223,898.63 in connection with Caremark's improper processing of DoD Claims. Altius contends that it withheld these payments under Sections 14.2(a)(i) and (ii) of the MPDP Agreement. See MPDP Agreement at § 14.2(a)(i) and (ii). Section 14.2(a)(i) states, in part that "COVENTRY or PLAN shall be financially responsible for the payment of Prescription Drug Benefit claims when processed in accordance with this Agreement [the MPDP Agreement]." Id. at § 14.2(a)(i). "Section 14.2(a)(ii) provides, in part that "[i]f COVENTRY or a PLAN disputes any item on the statement of account, COVENTRY or the PLAN shall state the amount in dispute in writing within thirty (30) days of the date of the statement of account." Id. at § 14.2(a)(ii). Coventry maintains that this language in the Agreement authorizes it to withhold payment, because Caremark did not "process [DoD pharmacy claims submitted by Altius members] in accordance with [the MPDP Agreement." It further asserts that Caremark is liable to for damages arising from the improper payment of DoD HMO claims.

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence and justifiable inferences based on facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 460 (6th Cir. 2001).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325. This may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim or by attacking the nonmoving party's evidence to show why it does not support a judgment for the nonmoving party. 10a Charles A. Wright et al., Federal Practice and Procedure § 2727 (2d ed. 1998).

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

## III.  ANALYSIS AND DISCUSSION

### A.  Operative Legal Standards

At issue in this lawsuit, now that its scope has been narrowed, is a subset of a subset of the millions of pharmacy claims Caremark processed for Coventry over the course of the parties' ten-year relationship—in particular, reimbursement requests from the DoD pharmacies for claims submitted by dual-eligible individuals covered by a Coventry HMO plan.

The law governing these claims is complicated. In situations where active-duty military personnel or their family members also have healthcare coverage through private insurers such as Coventry, the United States may recover from the private insurer to the same extent to which the insurer would be liable to the individual plan participant. 10 U.S.C. § 1095(a). More specifically, when the DoD (or other covered government agency) has paid for a prescription on behalf of a beneficiary with private prescription drug coverage, the agency may seek reimbursement from the private health plan, such as Coventry, as follows:

> In the case of a person who is a covered beneficiary, the United States shall have the right to collect from a third-party payer reasonable charges for health care services incurred by the United States on behalf of such person through a facility of the uniformed services to the extent that the person would be eligible to receive reimbursement or indemnification from the third-party payer if the person were to incur such charges on the person's own behalf.

*Id.* § 1095(a)(1). The statute further provides that "[n]o provision of any insurance . . . or health plan contract . . . having the effect of excluding from coverage or limiting payment of charges for certain care shall operate to prevent collection by the United States under subsection (a) if that care is provided . . . by a provider with which the third party payer has no participation agreement." *Id.* § 1094(b)(4). The

regulations implementing that statute state that "[t]he statutory obligation of the third party to pay is not unqualified." 32 C.F.R. § 220.4(a). Rather, a third-party payer is obliged to pay to the same extent "the beneficiary would be eligible to receive reimbursement or indemnification from the third party payer if the beneficiary were to incur the costs on the beneficiary's own behalf." 32 C.F.R. § 220.2(a); 32 C.F.R. § 220.4. Thus, the "general rule" is that "[e]xpress exclusions or limitations in third party payer plans that are inconsistent with 10 U.S.C. § 1095(b) are inoperative," and "[t]hird party payers may not treat claims arising from services provided in facilities of the uniformed services less favorably than they treat claims arising from services provided in other hospitals. 32 C.F.R. § 220.3(b)(1) & (3). In other words, as Caremark argues, the statute and its regulations generally require that DoD pharmacy claims must be treated as in-network even if the DoD pharmacies are out-of-network (as they are in this case, because neither Caremark nor Coventry had any provider contracts with DoD pharmacies).

Notwithstanding, "after any impermissible exclusions have been made inoperative" pursuant to § 220.3, "reasonable terms and conditions of the third party payer's plan that apply generally and uniformly to services provided in facilities other than facilities of the uniformed services may also be applied to services provided in facilities of the uniformed services." 32 C.F.R. § 220.4(b)(1). Specifically, among other exceptions, "reasonable [g]enerally applicable exclusions in Health Maintenance (HMO) plans of non-emergency or non-urgent services provided outside the HMO (or similar exclusions[)]" are permissible. 32 C.F.R. § 220.4(c)(3). The regulations require that, "[i]n order to establish that a term or condition of a third party payer's plan is permissible, the third party payer must provide appropriate documentation to the facility of the Uniformed Services . . . includ[ing] copies of policies, employee certificates, booklets, or handbooks, or other documentation detailing the plan's health care benefits, exclusions, limitations . . . and other pertinent policy or plan coverage and benefit information." *Id.* § 220.4(d).

Based on the statute and implementing regulations, the Court concludes that, while the law clearly prohibits the application of certain plan restrictions to DoD claims, the law also appears to authorize the denial of DoD claims for reimbursement for prescriptions filled at DoD pharmacies that are submitted on behalf of military beneficiaries who are also participants in HMO plans that restrict payment of claims for services provided outside the HMO. However, in order for a third-party payer to establish

that it could lawfully deny a DoD pharmacy claim on the basis of the HMO exception, that third party, here either Caremark or the specific Coventry plan to which the exception applied, had to submit documentation showing that the exception applies.

Thus, the questions that remain to be resolved in this case are: (1) Which party under the MPDP Agreement was responsible for identifying and applying the HMO exception? And (2) which party had the obligation to submit the requisite paperwork authorizing application of the HMO exception to the DoD?

### B. The MPDP Agreement Construed in Light of Applicable Law

Caremark, citing 10 U.S.C. § 1095 and 32 C.F.R. § 220.3, maintains that in order to comply with the law it processed all DoD pharmacy claims as if they had been submitted by pharmacies in Caremark's or Coventry's network, without inquiry into whether the plan in which the participant was enrolled was or was not an HMO. In support of its motion for summary judgment, Caremark argues that it did not breach the agreement with Coventry because: (1) during the course of its ten-year contract with Coventry, it processed pharmacy reimbursement requests submitted by the DoD "in accordance with the law governing such claims" (Memo. at 1); (2) regardless of whether the so-called "HMO exception" applies to the claims at issue in this case, Coventry never provided Caremark with written instructions regarding the processing of DoD claims as it was required to do under the terms of the contract; and (3) Coventry did not provide Caremark with the basic information that Caremark would have needed in order to determine whether any given DoD pharmacy claim fit within the narrow HMO exception that Coventry now seeks to invoke, specifically, whether a particular plan was an HMO and, if so, the HMO's service area. In the alternative, Caremark argues that Coventry waived any breach-of-contract claim arising from Caremark's treatment of DoD Pharmacy claims allegedly subject to the HMO exception, because Coventry was aware that Caremark was treating all government claims as "in network" and failed to object.[8]

The Court has already concluded, as set forth above, that the HMO exception apparently applied to at least some of the pharmacy claims at issue here. Caremark's other arguments are addressed below.

---

[8] Caremark also refers to communications between Coventry and its new provider of pharmacy benefit management services as proof of its position. The Court finds that this line of argument is a red herring: The fact that Coventry and its current provider are now aware of and are trying to avoid the problems giving rise to the present lawsuit is irrelevant to the present proceedings.

### *(1)    Interpretation of the MPDP Agreement*

The parties agree that their contract dispute is governed by Maryland law. Under Maryland law,

> [t]he rules of contract interpretation are well-settled. The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law. . . . Maryland adheres to the principle of the objective interpretation of contracts. The court will giv[e] effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean. Thus, our search to determine the meaning of a contract is focused on the four corners of the agreement. [E]ffect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.

*Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008) (alterations in original; internal quotation marks and citations omitted). In the same vein, "[a]n interpretation which makes a contract fair and reasonable will be preferred to one which leads to either a harsh or unreasonable result." *City of Baltimore v. Indus. Elecs., Inc.*, 186 A.2d 469, 471 (Md. 1962). Further, a contract is not ambiguous simply because, in litigation, the parties offer different meanings to the language. *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md. 2007).

In the present case, the parties disagree as to the import of several provisions in the MPDP Agreement, but the Court does not find the Agreement to be ambiguous. One of the disputed contract provisions is a paragraph headed "Government Agency Submitted Claims," which states:

> COVENTRY acknowledges that government agencies . . . may submit to Caremark claims for, on behalf of and/or in the name of Covered Individuals. *COVENTRY authorizes Caremark to provide such data as requested by government agencies or their authorized agents*, and *further authorizes Caremark to process such Claims in accordance with COVENTRY's written direction, which shall be in accordance with applicable laws and regulations*. Caremark shall provide to COVENTRY a list of government agencies from whom Caremark may receive such claims, which may be updated from time to time by Caremark.

(Doc. No. 85, at 8, Amendment ¶ 14 (amending MPDP Agreement § 4.1(g)) (emphasis added).)

There is no information in the record as to whether Caremark provided Coventry a list of government agencies from which it might receive claims; the Court presumes that it did not for purposes of Caremark's motion. The record is clear that Coventry never gave Caremark written instructions for dealing specifically with DoD pharmacy claims, but Coventry contends that it provided all the written instruction necessary when it directed Caremark to deny all paper claims (which would include DoD pharmacy claims) unless they met certain criteria. It is obvious that at the time the parties executed the

MPDP Agreement, neither party was thinking in particular about DoD pharmacy claims or the cobweb of laws governing their processing.

Notwithstanding, there is apparently no dispute that Caremark had an obligation under the MPDP Agreement to reject claims from Non-Participating Pharmacies (out-of-network pharmacies) if the individual member's plan did not include coverage for prescriptions filled by Non-Participating Pharmacies. In addition, the MPDP Agreement expressly required Caremark's compliance with all federal laws and regulations, and further documented Caremark's agreement to "comply with any and all applicable COVENTRY and COVENTRY HEALTH PLANS' programs, policies and procedures, as may be enacted, and revised from time to time, including, but not limited to, . . . participating provider requirements, . . . billing and claims submission policies, . . .COVENTRY and COVENTRY HEALTH PLANS' Formulary and prescription drugs and network pharmacy use requirements . . . ." (Doc. No. 82, MPDP Agreement § 2.4(b).) Finally, Coventry was obligated under the contract to reimburse Caremark only for those claims that Caremark processed properly, in accordance with its contractual obligations.

In sum, reading these various provisions and construing their intent based on the language within the four corners of the contract, the Court finds that Caremark contractually assumed the obligation to understand how federal law affected its obligations under the contract. With respect to its argument that it did not have the basic information that it needed in order to determine whether a DoD pharmacy claim fit within the HMO exception, there is a question of fact as to whether Caremark knew which Coventry plans were HMOs, and in any event the parties' agreement allocated responsibility to Caremark to inform Coventry that it was receiving claims from the DoD, and that in order to process those claims, Caremark would need: (a) additional information in order to determine whether the claim fell within the HMO exception, including the HMO service area, and (b) documentation to support any assertion that a particular reimbursement claim for an HMO member fell within the HMO exception, as required by 32 C.F.R. 220.4(d).

On the basis of these conclusions, the Court finds that Caremark is not entitled to summary judgment in its favor on the breach of contract issue.

### *(2)* *Disputed Issues of Fact Preclude Judgment on the Issue of Waiver.*

Under Maryland law, waiver is defined as "the intentional relinquishment of a known right, or such

conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *BarGale Indus., Inc. v. Robert Realty Co.*, 343 A.2d 529, 643 (Md. 1975); *Gould v. Transam. Assocs.*, 167 A.2d 905, 909 (Md. 1961) (citations omitted). Further, "[A]cts relied upon as constituting a waiver of the provisions of a contract must be inconsistent with an intention to insist upon enforcing such provisions." *Canaras v. Lift Truck Servs., Inc.*, 322 A.2d 866, 878 (Md. 1974). "The right or advantage waived must be known; '[t]he general rule is that there can be no waiver unless the person against whom the waiver is claimed had full knowledge of his rights, and of facts which will enable him to take effectual action for the enforcement of such rights.'" *Taylor v. Mandel*, 935 A.2d 671, 687 (Md. 2007) (quoting *Armour Fertilizer Works v. Brown*, 44 A.2d 753, 755 (1945)). The burden of proof is upon the proponent of the defense. *Canaras*, 322 A.2d at 879.

Here, the evidence is equivocal as to whether Coventry had any knowledge prior to March 2009 that Caremark was treating all DoD pharmacy claims, including those to which the HMO exception might apply, as in-network. Caremark has presented evidence that Coventry knew that government claims were being treated as in-network for some of its plans. Coventry has introduced testimony indicating those particular plans are not at issue here and that the rules that governed the processing of claims for those plans did not apply across the board to all Coventry health plans. Caremark has presented evidence that conversations took place between representatives from both companies regarding the treatment of DoD pharmacy claims; Coventry has introduced evidence that those conversations did not take place at all.

In sum, there are clearly material issues of disputed fact as to whether any waiver occurred; Caremark is not entitled to summary judgment on this ground.

## IV. CONCLUSION

For the reasons set forth herein, Caremark's motion for summary judgment will be granted insofar as the motion seeks judgment as to Coventry's claim for a declaratory judgment. The motion will be denied both as to Coventry's breach-of-contract claims and as to Caremark's counterclaims.

An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge